## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. **STATE OF OKLAHOMA**<br><br>*Plaintiff*,<br><br>v.<br><br>1. **MIGUEL CARDONA, in his official capacity as the Secretary of Education; and**<br><br>2. **UNITED STATES DEPARTMENT OF EDUCATION;**<br><br>*Defendants*. | **Case No.** CIV-24-461-HE |

## STATE OF OKLAHOMA'S COMPLAINT

1.       Through President Biden, the U.S. Department of Education seeks to rewrite the historic regulatory scheme of Title IX of the Educational Amendments Act of 1972 by coercing States to adopt a newfound standard for determining a student's eligibility to participate on a male or female athletic team. The crux of Title IX ensures equal opportunity for female athletes participating in athletics by barring discrimination "on the basis of sex" by schools receiving federal funds. The U.S. Department of Education has fundamentally altered the protections afforded to female athletes under Title IX by virtue of mandating "gender identity" into the framework of limiting or denying a student's eligibility to participate on a male or female team. State recipients, like Oklahoma, that have conflicting state laws will face enforcement actions and the loss of federal education funding if not compliant with the now formally Amended Code of Federal Regulations. The State of Oklahoma brings this Complaint against the Defendants to enjoin and invalidate the new Title IX regulations.

## INTRODUCTION

2.　　More than half a century ago, Congress enacted Title IX of the Education Amendments of 1972 to promote equal opportunity for male and female athletes. *See* 20 U.S.C. § 1681(a). The text of the statute and corresponding regulations recognize an "equal athletic opportunity for members of both sexes," and refer to those two sexes as, "Boy," and "Girl." 34 C.F.R. § 106.41(c); 20 U.S.C. § 1681(a)(7).

3.　　Since the enactment of Title IX, the thematic intent of the statute — providing equality for students in athletics — has been carried out by schools across the country. From its inception to present day, not only has the statute recognized the natural differences between men and women, but so too has our highest Court. *See United States v. Virginia*, 518 U.S. 515, 534 (1996) (Ginsberg, J.) ("Physical differences between men and women, however, are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'") (quoting *Ballard v. U.S.*, 329 U.S. 187, 193 (1946)). Under this core principle, Title IX granted males and females an "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *Id.* at 532. Title IX does so by barring recipients of federal educational funding from engaging in discrimination "on the basis of *sex*." 20 U.S.C. § 1681(a) (emphasis added).

4.　　Indeed, all of the tools of statutory interpretation support reading this statute as barring discrimination based on sex, not the distinct term "gender identity" and associated theories. *See Ohio v. Becerra*, 87 F.4th 759, 769 (6th Cir. 2023) ("The traditional tools of construction include consideration of a statute's text, structure, history, and purpose." (cleaned up)); *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020) (explaining that courts "normally interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment").

5.      Despite the plain and clear scope of Title IX, President Biden's Department of Education has finalized a new Title IX rule that fundamentally alters the meaning of Title IX's bar on sex discrimination. The rule, which takes effect on August 1, 2024, declares that "sex" is an expansive concept whose bounds it need not define. Instead, under the Department's view, unlawful "sex discrimination" covers "any discrimination that depends" even "in part on consideration of a person's sex," 89 Fed. Reg. at 33,803, including but not limited to, "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," *id.* at 33,886 (adding 34 C.FR. § 106.10).

6.      This Final Rule flips fifty (50) year achievement on its head. In doing so, it attempts to rewrite Title IX, it ignores the literal text of the statute and the purpose behind its creation, it disregards the lack of public support for the proposed rule, and it jeopardizes the equal opportunity that has been afforded to female athletes ever since the establishment of the statute. The Department attempts to make these drastic and detrimental changes while relying on a Supreme Court case that has no connection to Title IX. Perhaps worst of all, implementation of the Final Rule would serve to isolate and deny the group of athletes that the statute was originally designed to promote and protect — female athletes.

7.      The Final Rule then compounds its erroneous reading of sex discrimination by adopting an expansive definition of what counts as prohibited "harassment" for Title IX purposes. Under the Final Rule, repercussions risk running to any speech or religious expression that might reasonably be deemed "unwelcome," "offensive," and "limit[ing]" of a student's educational participation or benefits. 89 Fed. Reg. at 33,884 (amending 34 C.F.R. § 106.2); *see also id.* at 33,562.

8.     The Final Rule usurps authority that belongs to the States and to Congress. It violates the Tenth Amendment of the Constitution by attempting to expand into public school issues that must be left to the states and boards of education. Specific to Oklahoma, the Final Rule runs in direct conflict with an already existing state statute: the "Save Women's Sports Act." *See* Okla. Stat. tit. 70, § 27-706. The decisions of states and boards of education should be undisturbed by the federal system unless the state's action is "clearly unconstitutional." *See Sandusky v. Smith*, 2012 WL 4592635, at \*8 (W.D. Ky. Oct. 2, 2012) (quoting *Petrey v. Flaugher*, 505 F. Supp. 1087, 1090 (W.D. Ky. Jan. 28, 1981)). Such an action would interfere with each States' decision-making authority in educational settings, a right established by the Constitution and our highest Court.

9.     The Final Rule also intercepts congressional authority. Simply put, the responsibility and power to make new legislation "lies in Congress." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1753 (2020) (majority opinion). While agencies do have authority to propose new rules, that authority does not extend to rules which go against statutory language and longstanding interpretation of the law. A founding principle of this country is that the power to make law is delegated to elected representatives, not unelected agency officials. And when agency officials do propose new rules, those rules should not go "beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). In other words, new rules should consider what Congress meant at the time the laws were written. In contrast, the Final Rule attempts to expand the meaning of Title IX in a way that is unreasonable and unconstitutional. The lack of clear congressional authorization for the Final Rule's unprecedented gender-identity mandate also requires invalidating the rule under the major-questions doctrine.

10.     Moreover, rather than provide needed clarity, the Final Rule creates more questions and confusion. Because the Final Rule is set to take effect in a matter of months, it will be coupled with numerous issues. The Final Rule would only serve to inject confusion about the treatment of transgender individuals based on the types of sport, level of competition, age, individual skill, individual size, individual strength, and other areas of individual development, among many others. Given that the Final Rule ignores biological sex and allows a transgender individual to be placed on a team based on those developmental attributes, it would force States and schools to rely on subjective stereotypes about male and female athletes by their generalized abilities, rather than objective criteria like biological sex. This is in direct conflict with federal law. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that sex-based classifications should not be based on "generalizations about the different talents, capacities, or preferences of males and females," while also affirming that biological sex is not a stereotype).

11.     Plaintiff Oklahoma opposed the Department's approach for these and many additional reasons. Yet in adopting the Final Rule, the Department failed to respond to many commenters' critiques or with adequate explanations or substantial supporting evidence.

12.     Absent this Court's immediate intervention, the Final Rule will inflict severe irreparable harm on Plaintiff Oklahoma, its educational programs and policies, and its citizens.

13.     Considering the Final Rule is set to take effect in mere months, Plaintiff Oklahoma faces imminent, unrecoverable compliance expenses and risk of liability in private suits. These compliance sums and efforts will be substantial.

14.     Plaintiff Oklahoma now seeks this Court's intervention to protect its interests and constitutional principles, under which Congress — not unelected members of the Department of Education — has exclusive power to pass and amend laws that apply nationwide. This Court

should stay the Final Rule's effective date and enjoin its enforcement pending judicial review, and ultimately issue final relief vacating and setting aside the Final Rule in *toto*.

## PARTIES

15.     Plaintiff Oklahoma is a sovereign State and subject to Title IX as the administrator and/or operator of numerous "educational program[s]" and "activities" that "receiv[e] Federal financial assistance" within the meaning of Title IX. 20 U.S.C. § 1861. Gentner Drummond is the Attorney General of Oklahoma. Attorney General Drummond is authorized to "initiate or appear in any action in which the interests of the state or the people of the state are at issue" and to "monitor and evaluate any action by the federal government including, but not limited to, . . . rules or regulations promulgated by an agency of the federal government." Okla. Stat. tit. 74, § 74-18b(3),(24).

16.     Defendant the United States of America is the federal sovereign and is sued under 5 U.S.C. §§ 702–03 and 28 U.S.C § 1346.

17.     Defendant Miguel Cardona is the Secretary of the U.S. Department of Education and is responsible for its administration, including the effectuation of the Title IX via rulemaking. 20 U.S.C. § 3474; 20 U.S.C. § 1682. Defendant Miguel Cardona is sued in his official capacity.

18.     Defendant U.S. Department of Education is an executive agency of the federal government responsible for enforcement and administration of Title IX. 20 U.S.C. § 3411, 3441.

19.     Together, Defendants are referred to as the "Department."

## JURISDICTION AND VENUE

20.     The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff Oklahoma challenges the Secretary and the Department's actions under the Administrative Procedure Act's provision for judicial review of agency action, 5 U.S.C. § 702,

and the scope of the Department's authority under Title IX, *see* 20 U.S.C. § 1683 (providing for judicial review of "agency action" effectuating Title IX).

21.     The Court also has jurisdiction under 28 U.S.C. § 1346 because this case involves a claim against an agency and employee of the federal government.

22.     An actual controversy exists between the Parties under 28 U.S.C. § 2201(a).

23.     The Court has authority to grant Plaintiff Oklahoma the requested relief and other appropriate relief under 5 U.S.C. §§ 705–06, 28 U.S.C. §§ 2201–02 (the Declaratory Judgment Act), and its inherent equitable powers.

24.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1). Defendants are agencies of the United States and officers of the United States in their official capacities. Plaintiff Oklahoma is a resident of every judicial district in its sovereign territory, including this judicial district and division, and a substantial part of the events or omissions giving rise to Plaintiff Oklahoma's claims arose in this district.

25.     The Final Rule, by design, regulates schools and other Title IX recipients across the country, including those located in the State of Oklahoma. The Court thus has personal jurisdiction over the Secretary for purposes of this action because his immunity has been abrogated by 5 U.S.C. § 702 and he has "submi[tted]" to such jurisdiction "through contact with and" regulatory "activity directed at" Plaintiff Oklahoma and its schools. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 881 (2011).

# FACTUAL ALLEGATIONS

**I.     The Longstanding Purpose of Title IX: Promote Equal Opportunities for Women in Education and Sports.**

**A.     The History of Title IX**

26.     The United States achieved a historic victory on June 23, 1972, when Title IX was enacted as part of the Education Amendments.

27.     Title IX's origin lies in the 1965 presidential Executive Order 11246 prohibiting federal contractors from discrimination in employment on the basis of race, color, religion, or national origin. Executive Order 11246 was amended by President Johnson, effective October 13, 1968, to include discrimination based on sex (renamed as "Executive Order 11246 (1965) as amended by Executive Order 11375 (1967)"). In March 1970, U.S. House Representative Martha Griffiths gave what appears to be the first speech in the U.S. Congress concerning discrimination against women in education, citing 5 U.S.C § 7151 (1970), Executive Order 11246, and Executive Order 11375. *See* Congressional Record — House, *The Federal Government Violates National Policy*, Mar. 9, 1970, at 6398–40.

28.     In summer of 1970, U.S. House Representative Edith Green, who chaired the House Special Subcommittee that dealt with higher education, led seven (7) days of hearings on the topic of discrimination against women in federally assisted education programs and employment in education. These hearings were the first legislative step toward the enactment of Title IX. *See Hearings Before the Special Subcommittee on Education of the Committee on Education and Labor House of Representatives on Section 805 of H.R. 16098*, 91st Cong. 1–2 (1970).

29.     The original version of the bill, which was part of a larger measure on higher education, proposed to amend Title VII of the 1964 Civil Rights Act (prohibiting discrimination in employment on the basis of race, color, religion, sex, or national origin) to cover employees in

educational institutions. The measure also proposed to amend Title VI of the Civil Rights Act (prohibiting discrimination on the basis of race, color, or national origin in any program receiving federal financial assistance) to cover sex discrimination, and to extend the Equal Pay Act to cover executives, administrators, and professionals.

30.     In 1972, Congress enacted the statute now called "Title IX." The preamble to Title IX states: "No person in the United States shall, on the basis of *sex*, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any educational programs or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added).

31.     Although Title IX's text did not expressly reference athletics, Congress quickly amended the statute to add the "Javits Amendment." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). That provision directed the Department of Education's predecessor agency, the Department of Health, Education, and Welfare ("HEW"), to propose regulations "implementing [Title IX's] provisions[,] . . . includ[ing,] with respect to intercollegiate athletic activities[,] reasonable provisions considering the nature of particular sports." *Id.*

32.     The Javits Amendment supplemented the statute's general authorization of federal agencies administering federal financial assistance to education programs and activities to "effectuate" Title IX's provisions via "rules, regulations, or orders." 20 U.S.C. § 1682.

33.     Congress also authorized federal agencies to enforce Title IX's prohibition by terminating a non-compliant recipient's Title IX assistance. 20 U.S.C. § 1682.

**B.     The Clear Scope of Title IX**

34.     Many scholars attribute the dramatic improvement in women's educational opportunities since 1972, at least in part, to Title IX's simple pronouncement: "No person in the United States shall, on the basis of *sex*, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (emphasis added); *see, e.g.*, Jocelyn Samuels & Kristen Galles, *In Defense of Title IX: Why Current Policies Are Required to Ensure Equality of Opportunity*, 14 MARQ. SPORTS L. REV. 11, 18–19 (2003); Elizabeth Kaufer Busch & William E. Thro, *Restoring Title IX's Constitutional Integrity*, 33 MARQ. SPORTS L. REV. 507, 507–08, n.1 (2022).

35. At the time Title IX was enacted in 1972, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females — particularly with respect to their reproductive functions." *Bridge on behalf of Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 WL 150598, at *7 (W.D. Okla. Jan. 12, 2024) (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (Niemeyer, J. dissenting) (collecting dictionary definitions)). In 1961, the Oxford English Dictionary defined sex as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these." THE OXFORD ENGLISH DICTIONARY 578 (1961). In 1970, the American College Dictionary defined sex as "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished." THE AMERICAN COLLEGE DICTIONARY 1109 (1970). In 1979, Webster defined it as "the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females." WEBSTER'S NEW COLLEGIATE DICTIONARY 1054 (1979). Although not an exhaustive list, the above excerpts alone show that at the time Title IX was enacted, "sex" was defined by biology and reproductive functions.

36.     The plain meaning of this provision negates that it applies to terms like "gender identity" that are distinct from "sex." As the en banc Eleventh Circuit recognized, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment [in 1972] show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 197, 815–16 (11th Cir. 2022).

37.     As for context, Title IX expressly states that it does not "prohibit any educational institution … from maintaining separate living facilities for the different sexes," i.e., "*for*" males and females. 20 U.S.C. § 1686 (emphasis added). Senator Bayh explained that such "differential treatment by sex" was permissible "where personal privacy must be preserved." 118 Cong. Rec. 5,807 (statement of Sen. Bayh). It is reasonable that Title IX would not treat the provision of sex-separate facilities as discriminatory. Sex-based classifications like this one, unlike race-based classifications, are not inherently complicated because they are rooted in "enduring' differences between men and women." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (quoting *Virginia*, 518 U.S. at 533). In other words, they do not treat "similarly situated" individuals unequally. *Bostock*, 590 U.S. at 657.

38.     Moreover, § 1686's safe-harbor for "separate" male and female facilities "would be rendered meaningless" if "sex" did not refer to a male-female binary based on physiological differences. *Adams*, 57 F.4th at 813. Interpreting sex discrimination to encompass "gender identity" discrimination, for example, "would result in situations where an entity would be prohibited from installing or enforcing the otherwise permissible sex-based carve-outs when the carve-outs come into conflict with a transgender person's gender identity." *Id.* at 814. That would grant transgender persons "dual protection under Title IX based on both sex and gender identity,"

11

impermissibly giving "'different meanings to the same [statutory] phrase.'" *Id.* (quoting *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019)).

39.     This treatment of "sex" as a male-female binary reflects Title IX's linguistic context. "The phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications." Ryan T. Anderson & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do*, at 9, The Heritage Found. (2017), https://perma.cc/VG5N-ZAYE. And the word "gender" had itself "been coined only recently in contradistinction to sex." *Id.*

40.     These textual, structural, and linguistic clues accord with the evidence that Congress enacted Title IX with a sex-specific purpose: to remedy discrimination against women in American education by promoting equal educational opportunities for them going forward.

## II.     Prior Regulatory Context.

41.     Despite decades of administrative interpretations confirming Title IX's limited application to sex discrimination, this interpretation quickly shifted during the Obama Administration when it promulgated that "Title IX's sex discrimination prohibition extends to claims of discrimination" based solely on "gender identity." U.S. Dept. of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014) (rescinded in 2017), https://bit.ly/44ixq2u. The Department provided no explanation for its reversal.

42.     A subsequent "Dear Colleague" letter asserting that Title IX "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status," compounded this deficiency. U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rts., *Dear Colleague Letter on Title IX and Transgender Students*, at 1 (May 13, 2016) (rescinded in 2017), https://perma.cc/G5VG-ZNV9 [hereinafter "2016 Dear Colleague Letter"];

*see also* U.S. Dep't of Educ., Off. for Civ. Rts., *Letter to Emily T. Prince, Esq.*, at 1-2 (Jan. 7, 2015) (rescinded in 2017), https://perma.cc/4ZRV-8LQ7 (previewing this position). The guidance failed to square the Department's new reading with its previous interpretation of "sex." Nor did it offer any legal analysis supporting the new interpretation. Instead, it asserted that a recipient would discriminate "on the basis of sex" if it failed to "treat students consistent with their gender identity," even if a student's gender identity conflicted with records of his or her sex. 2016 Dear Colleague Letter at 3.

43.     The Department suggested that a recipient's failure to compel faculty and staff to "use pronouns and names consistent with a transgender student's gender identity" could violate this newly interpreted Title IX. *Id.* A recipient would also engage in sex discrimination under the Department's reading if it failed to permit students to access restrooms, locker rooms, shower facilities, and housing, or if the recipient failed to allow students to participate in activities, including sports, based on their gender identity alone. *Id.* at 3-4.

44.     A federal court in Texas enjoined the enforcement of the Dear Colleague letter and related guidance nationwide. *See Texas v. United States*, 201 F. Supp. 3d 810, 816 n.4, 836 (N.D. Tex. 2016), *clarified by*, No. 7:16-cv-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016). The court held that the plaintiffs would likely succeed on the merits in arguing (a) that the Department and other defendants violated the APA's notice and comment requirements by adopting "legislative and substantive" rules in the guise of guidance, and (b) that the ordinary public meaning of "sex" as used in Title IX unambiguously precluded construing that term to mean "gender identity." *Id.* at 827–34. The injunction was dissolved when the plaintiffs voluntarily dismissed their suit after the guidance was withdrawn. *See* Pls.' Notice of Voluntary Dismissal, *Texas v. United States*, No. 7:16-cv-00054-O (N.D. Tex. Mar. 3, 2017), ECF No. 128.

45.     In response to growing criticism, under the Trump Administration, the Department rescinded both the Dear Colleague Letter and the 2014 Questions and Answers in 2017. However, it soon became apparent that the withdrawal could not repair the damage caused by the two (2) guidance documents on its own. *See* Candice Jackson, OCR, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 9, 2017). As the Department later explained, neither action "require[ed] or result[ed] in wholesale changes to the set of expectations guiding recipients' responses to sexual harassment." 85 Fed. Reg. at 30,029. Hence, many, if not most, recipients "chose not to change their Title IX policies and procedures" as a precaution against stigma and liability. *Id.*

46.     The Department, therefore, initiated a round of notice-and-comment rulemaking, after which it published a comprehensive set of regulations governing recipients' obligations to prevent sex discrimination in their programs and activities. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (the "2020 Regulations"). The 2020 Regulations took effect on August 14, 2020.

47.     The 2020 Regulations also addressed the question of whether discrimination "on the basis of sex" encompassed sexual orientation and gender identity. Although the Department declined to define "sex" in the 2020 Regulations because it was not necessary to effectuate the rules and would have consequences that extended outside of the proposed rulemaking, the Department noted that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification." It further observed that "provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." 85 Fed. Reg. at 30,178.

### III.    The Final Rule Defies Title IX's Intent and Statutory Language.

### A.  The Proposed Rule

48.    In opposition to the 2020 Regulations, President Biden issued an executive order charging the Secretary of Education to review "all existing regulations, orders, guidance documents, policies, and any other similar agency actions" for consistency with his administration's Title IX policy. Executive Order 14021, 86 Fed. Reg. 13,803 (Mar. 11, 2021), http://bit.ly/4aWLPUI.

49.    In that executive order, President Biden presupposed that "on the basis of sex" included sexual orientation or gender identity. *Id.* The Department conducted its review and subsequent rulemaking bound by President Biden's instruction that Title IX should be interpreted as encompassing sexual orientation and gender identity notwithstanding decades of precedent to the contrary.

50.    On July 12, 2022, the Department published in the Federal Register a notice of proposed rulemaking to amend the 2020 Regulations. *See* Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (July 12, 2022).

51.    On April 13, 2023, the Department published in the Federal Register a notice of proposed rulemaking to amend regulations implementing Title IX "to set out a standard that would govern a recipient's adoption or application of sex-related criteria that would limit or deny a student's eligibility to participate on a male or female athletic team consistent with their gender identity." *See* Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (April 13, 2023). And notably, the

proposed regulation "would clarify Title IX's application to such sex-related criteria and the obligation of schools and other recipients of Federal financial assistance from the Department (referred to below as "recipients" or "schools") that adopt or apply such criteria to do so consistent with Title IX's nondiscrimination mandate." *Id.*

52.     Oklahoma, through its Attorney General, submitted a comment before the thirty (30) day comment period for the Proposed Rule closed on May 15, 2023. In its comment, Oklahoma addresses that the Proposed Rule erroneously relies on *Bostock v. Clayton Cnty., Ga*., 140 S. Ct. 1731 (2020), ignores the statute's specific language, and worst of all, harms and restricts the entire class of individuals that Title IX originally sought to build up and protect — female athletes.

53.     Oklahoma's comment further addresses how the Proposed Rule is in direct violation of the Tenth Amendment and the Save Women's Sports Act. Set out in Oklahoma's Save Women's Sports Act, "[p]rior to the beginning of each school year, the parent or legal guardian of a student who competes on a school athletic team shall sign an affidavit acknowledging the *biological sex* of the student at birth." Okla. Stat. tit. 70, § 27-106(D) (emphasis added). "If there is any change in the status of the biological sex of the student, the affiant shall notify the school within thirty (30) days of such change." *Id*. Female athletic teams "shall not be open to students of the male sex." § 27-106(E)(1). "Any student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of [§ 27-106(E)(1)] shall have a cause of action for injunctive relief, damages and other relief available permitted by law against the school." § 27-106(E)(2). Indeed, Oklahoma highlighted that the Proposed Rule obstructs and conflicts with Oklahoma's established law.

54.     Despite these deficiencies and widespread opposition throughout the comment process, the Department pushed forward and published the Final Rule in the Federal Register on April 29, 2024. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024).

**B.  The Final Rule**

55.     The Final Rule purports to preempt all "State or local laws or other requirements" that conflict with its terms, 89 Fed. Reg. at 33,885, and it applies to any school "program or activity" regardless of whether the activity occurs within the school — or even within the United States. 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.11) ("Final Rule").

56.     The Final Rule unlawfully alters Title IX's regime by expanding what constitutes unlawful sex discrimination by incorporating so-called "sex characteristics," including "gender identity." Additionally, the Final Rule broadly redefines the speech and conduct that constitute sex-based harassment subject to intervention or punishment by school administrators and private Title IX plaintiffs.

**i.       The Department's Redefining of "On the Basis of Sex"**

57.     Pursuant to Title IX, every school which accepts federal funds is bound by the following language: "No person in the United States shall, on the basis of *sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphases added).

58.     The text of the statute and corresponding regulations recognize an "equal athletic opportunity for members of both sexes," and refer to those two sexes as, "Boy," and "Girl." 34 C.F.R. § 106.41(c); 20 U.S.C. § 1681(a)(7).

59.    The Final Rule is inherently inconsistent with both the text of Title IX and the provisions of 34 C.F.R. 106.41 requiring a Title IX recipient provide equal athletic opportunity for members of both sexes. The Final Rule redefines the word "sex" to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. 33,886 (to be codified at 34 C.F.R. § 106.10).

60.    In accordance with the Department's reinvention of Title IX, the Final Rule threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" and comply with any "appearance codes (including dress and grooming codes)" based on gender identity. *See, e.g.*, 89 Fed. Reg. at 33,816. The Final Rule dictates that a school violates Title IX's nondiscrimination prohibition if a transgender student is denied access to a bathroom or locker room of the opposite biological sex. *See, e.g.*, 89 Fed. Reg. at 33,818.

61.    "The Department cannot enforce Title IX in a manner that requires recipients to restrict any rights protected under the First Amendment."85. Fed. Reg. 30,071. But under the Final Rule, recipients have an obligation under the Final Rule to "take specific actions … to promptly and effectively prevent sex discrimination," including what the Final Rule defines as sex-based harassment. 89 Fed. Reg. at 33,887. It follows that recipients would have an obligation under the Final Rule to confront students and employees who refuse to affirm someone's gender identity, up to and including disciplinary proceedings, or risk being found in noncompliance with Title IX.

62.    The Final Rule also institutes a new, lower standard for sexual harassment. The Final Rule stipulates that "[s]ex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe *or* pervasive to limit or deny a student's ability

to participate in or benefit from a recipient's education program or activity." 89 Fed. Reg. at 33,516 (emphasis added).

63.    In adopting this standard, the Final Rule expands Title IX's prohibition on sex-based harassment, contrary to Supreme Court precedent. *Compare*, *e.g.*, 89 Fed. Reg. 33,498, *with Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999). Under *Davis*, the Supreme Court held that Title IX's proscriptions included sexual harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. The Final Rule ignores this precedent and institutes a sweeping new standard that would subject students, faculty, and staff to onerous investigations if they fail to use a transgender student's preferred pronouns.

64.    The 2020 Regulations purposefully adopted the *Davis* standard, "to ensure that speech and expression are prohibited only when their seriousness and impact avoid First Amendment concerns." 85. Fed. Reg. 30142. The Final Rule departs from this policy but fails to adequately justify the Department's change in position and further fails to explain how the looser standard conforms to the Constitution. The reason given by the Department is simply that the Defendants "believe[] a broader standard is appropriate." 89 Fed. Reg. at 33,498.

65.    The Final Rule also lacks objective standards, making every complaint subjective, not limited to those who visibly identify as transgender. Instead, it broadly encompasses those that only temporarily or intermittently identify as transgender. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013) (defining "transgender" to include "individuals who transiently" identify one way).

66.    The Final Rule is therefore ambiguous, overbroad, and vague, and it fails to adequately notify schools of adequate compliance to avoid onerous investigations.

### ii.     The Department's Improper Reliance on *Bostock*

67.     The Department's reliance on *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020), as a basis to redefine sex discrimination under Title IX, is wholly misplaced. For starters, *Bostock* does not support the Final Rule because it involves a different statute, different language, a different group of individuals, and different factual groundwork. *See generally id.* Because the Department relies heavily on *Bostock*, it must be discussed here; not for its connections to Title IX, but rather its irrelevance.

68.     "Title VII is a vastly different statute" than "Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 168 (2005). Title IX is protecting a separate group of individuals than workplace employees in Title VII. And to state the obvious, Title IX involves an entirely separate statute than the one at issue in *Bostock*.

69.     In *Bostock*, the Supreme Court addressed Title VII. It held that through the narrow lens of Title VII of the Civil Rights Act, an employer cannot take adverse employment actions because of an individual's sexual orientation or gender identity. 140 S. Ct. at 1740. This adverse action was prohibited discrimination towards an employee "because of sex." *Id.*

70.     As if these factors were not distinct enough from the Final Rule, even in *Bostock*, the Supreme Court noted that "sex" referred "only to biological distinctions between male and female." *Id.* at 1739. It also stated that "transgender status" is a "distinct concept[] from sex." *Id.* at 1746–47.

71.     *Bostock*'s rationale was entrenched in the fact that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 1739 (citing *Nassar*, 570 U.S. at 360). On the contrary, Title IX does not use the "because of sex" language or incorporate a "but-for" standard like Title VII. Instead, Title IX's statutory language

involves discrimination "on the basis of sex." *See* 20 U.S.C. § 1681(a). Indeed, the *Bostock* Court neither discussed nor ruled on Title IX's dissimilar phraseology: "on the basis of sex." Despite this, Defendants erroneously blend Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1).

72.     Notably, *Bostock* even explicitly refrains from addressing gender identity in any other context than Title VII. 140 S. Ct. at 1753 (stating that it would not "address bathrooms, locker rooms, or anything else of the kind"). In fact, foreseeing how its opinion could be erroneously construed going forward, the Court in *Bostock* expressly declared that "none of these other laws are before us . . . and we do not prejudge any such question today." *Id.* In sum, *Bostock* did not prejudge nor interpret Title IX. *Bostock* is therefore irrelevant to the interpretation or rulemaking of Title IX.

73.     In comparison, the ultimate purpose of protecting athletes under Title IX is carried out by schools specifically accounting for a student's biological sex. In other words, Title IX allows schools to draw sex-based distinctions. It allows schools to provide "Boy or Girl conferences," and "[f]ather-son or mother-daughter activities." 20 U.S.C. § 1681(a)(7)–(8). Separate teams are created under the rules to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(b)–(c). These philosophies behind Title IX have stood for more than five (5) decades. Thus, the Department, in enacting the Final Rule, cannot rely on *Bostock* when it is distinguished by statutory authority, statutory language, and the group of individuals in which the statute is designed to protect.

### iii.     The Clear Statement Rule and the Major Questions Doctrine

74.     Even if there were ambiguity on whether Title IX adopts the Final Rule's definition of discrimination "on the basis of sex," that ambiguity must be resolved in favor of the State because conditions on federal funding must be stated clearly. *Adams*, 57 F.4th at 815.

75.     Congress enacted Title IX pursuant to its powers under the Spending Clause. *Davis*, 526 U.S. at 640 ("[W]e have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause[.]"). If Congress intends to impose a condition on the grant of federal funding under Title IX, it must do so with "a clear voice," "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

76.     This clear statement rule is required when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Adams*, 57 F.4th at 815 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) (internal quotations omitted).

77.     The use of the word "sex" in Title IX did not put educational institutions and programs on notice that by accepting funding from the federal government for educational services and activities, they are prohibited from providing bathrooms or other facilities for the two sexes. *See Adams*, 57 F.4th at 816. That is clear not only from historical practice but from Defendants' longstanding interpretation of Title IX and its implementing regulations, which "include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178.

78.     Similarly, courts will not assume that Congress has assigned questions of "deep economic and political significance" to an agency unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

79.     "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

80.     Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme …We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 160.

81.     The Final Rule will affect all elementary schools, secondary schools, postsecondary institutions, and other recipients of federal financial funds with far-reaching social and economic impact. Yet Title IX's language cannot be plausibly read to smuggle in a power for federal agencies to overturn the "unremarkable — and nearly universal — practice[s]" common in States' governance of schools. *Adams*, 57 F.4th at 796.

## IRREPARABLE HARM TO PLAINTIFF OKLAHOMA

82.     The Department's Final Rule inflicts significant, irreparable harm on Plaintiff Oklahoma that only prompt judicial intervention can redress.

83.     *First*, Plaintiff Oklahoma is unable to enforce its own laws without coming into conflict with the Final Rule. For example, Plaintiff Oklahoma's educational institutions that offer

male and female sports are forced to choose between complying with the Oklahoma's statutes and existing rules or complying with the Final Rule's prohibition on gender-identity discrimination.

84.     The Final Rule preempts Oklahoma laws governing athletics and causes irreparable harm to the State of Oklahoma's sovereign lawmaking authority. Set out in Oklahoma's Save Women's Sports Act, "[p]rior to the beginning of each school year, the parent or legal guardian of a student who competes on a school athletic team shall sign an affidavit acknowledging the *biological sex* of the student at birth." Okla. Stat. tit. 70, § 27-106(D) (emphasis added).[1]  "If there is any change in the status of the biological sex of the student, the affiant shall notify the school within thirty (30) days of such change." *Id.* Female athletic teams "shall not be open to students of the male sex." § 27-106(E)(1). "Any student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of [§ 27-106(E)(1)] shall have a cause of action for injunctive relief, damages and other relief available permitted by law against the school." § 27-106(E)(2).

85.     Similarly, the Final Rule's prohibition of harassment based on gender identity conflicts with Oklahoma's protections of student and faculty speech. *See* Okla. Stat. tit. 70, § 24-157; Okla. Admin. Code. § 210:10-1-23. Even before finalizing the Final Rule, the Biden Department, like the Obama Department before it, used Title IX investigations to promulgate its view of "faculty misgendering" as evidence of a "hostile environment based on sex" in violation of Title IX. And beyond such enforcement actions, educational institutions face the threat of private suit for violations of Title IX. *See Davis*, 526 U.S. at 642–43, 650.

86.     Oklahoma law provides that an employee or student of a public school or charter school "shall not be required, as a condition of employment, enrollment, or participation in any

---

[1] If the student is eighteen (18) years of age, that student will sign the affidavit "acknowledging his or her biological sex at birth." *Id.*

program, to refer to another person using that person's preferred title or pronouns if the personal

title or pronouns do not correspond to that person's sex."  H.B. 3120.

87.     *Second*, Plaintiff Oklahoma suffers the "irreparable harm of nonrecoverable

compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J.,

concurring in part and in the judgment); *Cloud Peak Energy Inc. v. United States Dep't of Interior*,

415 F. Supp. 3d 1034, 1042 (D. Wyo. 2019) (recognizing that the Tenth Circuit has previously

held that unrecoverable economic costs can constitute irreparable harm).

88.     *Third*, enforcement of the Final Rule threatens to collectively strip Plaintiff

Oklahoma of millions of dollars in federal Title IX funds and to impose substantial penalties

through private suits. This severe financial exposure in turn endangers important programs that

serve attendees of Plaintiff Oklahoma's schools and higher-education institutions.

89.     In Oklahoma, there are 1,720 public schools serving primary and secondary school-

aged children. Oklahoma also operates the Oklahoma School for the Blind and the Oklahoma

School for the Deaf. All these schools receive federal funds and are thus Title IX recipients.

90.     In 2023, the federal government allocated $224,661,041 to the Oklahoma State

Department of Education to fund Oklahoma schools.[2]

91.     Public and special schools in Oklahoma use such federal funds to provide

supplemental educational support and materials to students, offer non-academic support for

students, provide professional learning opportunities for teachers, offer technology for student use,

and for other purposes. Losing these funds will require these schools to eliminate certain services

---

[2] Office of Elementary & Secondary Education, *Funding Status & Awards*, Dept. of Educ. (July 7, 2023), https://oese.ed.gov/offices/office-of-formula-grants/school-support-and-accountability/title-i-part-a-program/funding-status/.

or seek new funding for them — and there is no guarantee that any other funding will be found to cover the lost funding.

92.     Oklahoma hosts twenty-five (25) public colleges and universities benefiting higher education. *See generally* Okla. Stat. tit. 70, § 3101 *et. seq.* All post-secondary education programs received approximately $350 million in federal funds in Fiscal Year 2022-23,[3] subjecting them to Title IX.

93.     These postsecondary institutions use federal funds for many purposes, including student loans, student grant aid, research and service, and veterans' affairs. Losing Title IX funds will require those institutions to eliminate certain educational services or seek new funding. Additionally, students who rely on federal funds to attend those institutions might have their education interrupted, resulting in disenrollment or abandonment of a degree or other program.

94.     Under Oklahoma law, postsecondary athletic teams that are sponsored by a school or sponsored by a private school whose students or teams compete against a school, "shall be expressly designated as" . . . "Men's," "Women's," or "Coed." Okla. Stat. tit. 70 § 27-106(C).

95.     Plaintiff Oklahoma thus faces a credible threat that the Department of Education will enforce the Final Rule against them and terminate federal assistance to noncomplying state entities. *See* 20 U.S.C. § 1682; *cf.* 89 Fed. Reg. 33,543 (amended § 106.6(b)) ("clarify[ing]" that Title IX regulations preempt "any State or local law" conflicting with them).

96.     *Lastly*, the Final Rule will force individual citizens of Plaintiff Oklahoma to endure a variety of irreversible harms.

97.     Students of both sexes will experience violations of their bodily privacy by students of a different sex. Indeed, the Final Rule also ignores psychological and safety concerns. For

---

[3] *See* U.S. Dept. of Educ., *Fiscal Years 2023-2025 State Tables for the U.S. Department of Education*, https://perma.cc/753G-GG3H (last visited May 5, 2024).

instance, a recent study points out that "limited research has explored girls' experiences of competing on boys' sports teams," noting unique challenges to female athletes. Melissa L. DeJonge, et al., *One of These is Not Like the Other: The Retrospective Experiences of Girl Athletes Playing on Boys' Sports Teams During Adolescence*, QUALITATIVE RES. IN SPORT, EXERCISE & HEALTH (Mar. 9, 2023). Female athletes describe "having to navigate tensions and problematic assumptions of girls' inferiority in sport." *Id*. Meanwhile, research shows that female athletes are more willing to participate in single-sex athletics and less likely to feel self-conscious in single-sex athletics. *See* Crystal Vargos, et al., *The Effects of Single-Sex Versus Coeducational Physical Education on American Junior High PE Students' Physical Activity Levels and Self-Competence*, 13 BIOMEDICAL HUM. KINETICS 170 (2021); Kelly Morgan, et al., *Formative Research to Develop a School-Based, Community-Linked Physical Activity Role Model Programme for Girls: Choosing Active Role Models to Inspire Girls*, BMC PUB. HEALTH (2019).

98.     Scholarships awarded to women will likely decrease as a result — and thereby, educational opportunity for women will decrease. And depending on the Rule's effective date in a particular State, schools could be forced to adopt new policies in the middle of the school year, creating potential disruptions to student learning and long-term learning losses. Judicial relief would avert these harms.

99.     Female athletes, for their part, will face unfair competition from physiologically superior competitors, will lose games, awards, and even championships to males, and will be exposed to a higher risk of injury. "[T]here are inherent differences between those born male and those born female and that those born male, including transgender women and girls, have physiological advantages in many sports." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 819 (11th Cir. 2022) (Lagoa, J., concurring).

100.     There are simply undeniable differences in "physical attributes that contribute to elite athletic performance" of a male versus a female in athletics. *See The Role of Testosterone in Athletic Performance*, DUKE CTR. FOR SPORTS L. & POL'Y (Jan. 2019). Studies provide the following differences between post-pubescent males and females: Males jump 25% percent higher than Females; Males throw 25% further than Females; Males run 11% faster than Females; Males accelerate 20% faster than Females. Jennifer C. Braceras, et al, *Competition: Title IX, Male-Bodied Athletes, & the Threat to Women's Sports*, INDEP. WOMEN'S F. & INDEP. WOMEN'S L. CTR. 20 (2021) (footnotes omitted).

101.     Specifically, as to studies on transgender females, even those who have lowered their testosterone levels to a range of an average biological female, they still retain many puberty-related advantages of muscle mass and strength seen in biological males. *See* Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression & Performance Advantage*, 51 SPORTS MED. 200 (2021). "[T]rans women and girls remain fully male-bodied in the respects that matter for sport; [and] because of this, their inclusion effectively de-segregates the teams and events they join." *See* Doriane Lambelet Coleman, et al., *Re-affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POL'Y 69, 108 (2020).

102.     Perhaps the Eleventh Circuit sums it up best: "But why does it matter if women and girls are given the equal opportunity to compete in sports? The answer cuts to the heart of why Title IX is seen as such a success story for women's rights." *Adams*, 57 F.4th at 820 (Lagoa, J., concurring). "Affirming the . . . conclusion that 'the meaning of "sex" in Title IX includes "gender identity"' would open the door to eroding Title IX's beneficial legacy for girls and women in sports." *Id.* Judicial relief would avert these harms.

## CLAIMS FOR RELIEF

### CLAIM I
### Violation of APA, 5 U.S.C. § 706(2)(A), (C) Agency Action Not in Accordance with Law and in Excess of Statutory Authority

103.    All allegations above are incorporated herein by reference.

104.    The Department of Education is a federal agency within the meaning of the APA.

105.    The Final Rule is "final agency action," 5 U.S.C. § 704, because it was published in the Federal Register following notice-and-comment rulemaking. *See* 89 Fed. Reg. 33,474 (Apr. 29, 2024). The Final Rule is the "'consummation' of the agency's decisionmaking process." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813, 195 L.Ed.2d 77 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). And "legal consequences will flow" from the Final Rule, *see id.* (quoting *Bennett*, 520 U.S. at 178), because Oklahoma schools must now comply with the Rule or else risk its federal education funding and potential liability under Title IX's private right of action. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91, 118 S. Ct. 1989, 141 L.Ed.2d 277 (1998).

106.    Plaintiff Oklahoma lacks another adequate remedy in court, and no rule requires that it appeal to a superior agency authority before seeking judicial review. 5 U.S.C. § 704.

107.    The APA requires courts to set aside and vacate agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C); *Bradford v. U.S. Dep't of Lab.*, No. 22-1023, 2024 WL 1866432, at *16 (10th Cir. Apr. 30, 2024); *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA, which provides that a reviewing court 'shall … set aside' unlawful agency action." (quoting 5 U.S.C. § 706(2)).

108.    The Department's redefinition of sex discrimination is unlawful because it contravenes Title IX's text and the meaning of the Department's own regulations.

109.    *First*, the "'traditional tools' of statutory interpretation" confirm that the Department's interpretation is "contrary to the clear meaning of" Title IX itself. *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Okla.*, 693 F.3d 1303, 1313 (10th Cir. 2012) (traditional rules of statutory construction mandate the clear law of congress prevail and not a different construction applied for an agency). Congress expressly limited Title IX's coverage to discrimination "on the basis of sex," and the ordinary public meaning of "sex" at the time of Title IX's enactment unambiguously excludes consideration of a person's gender identity. *See Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 WL 150598, at *6 (W.D. Okla. Jan. 12, 2024). And *Bostock*, which assumed that "sex" "refer[ed] only to biological distinctions between male and female" and held merely that Title VII bars hiring and firing based on sexual orientation and transgender status, does not require a different reading. *See id.* ; *see, e.g.*, *Bostock*, 590 U.S. at 681. The Department nonetheless reads Title IX's unambiguous prohibition on "sex-based" discrimination to cover action that conflicts with an individual's gender identity. And it says this gender-identity mandate applies to private bathrooms and shower facilities, among other spaces, despite the statute's clear provision for "living facilities" to be separated between the sexes. *See* 20 U.S.C. § 1686; *see Bridge*, No. CIV-22-00787-JD, 2024 WL 150598, at *6 (equating "bathrooms" with "living facilities").

110.    "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Because the Department's interpretation contravenes Title IX's plain meaning, it exceeds the Department's lawful authority to "effectuate" Title IX's provisions. 20 U.S.C. § 1682; *see also Util. Air*, 573

U.S. 302, at 327–28, 334; 5 U.S.C. § 706(2). This Court should adopt the reasoning of several courts that have invalidated similar readings of Title IX on this basis.

111.    Alternatively, even if "sex" as used in Title IX were an ambiguous term, the Department's interpretation is not entitled to *Chevron* deference. For one, the Department's reading falls outside the range of reasonable interpretations of the statutory text because it purports to resolve a policy issue of major political significance without clear congressional authority, *see West Virginia v. EPA*, 597 U.S. 697, 721–25 (2022), and fails to "construe ['on the basis of sex'] to avoid serious constitutional doubts." *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 516 (2009). For another, the Department has read Title IX to impose a new federal-funding condition in an area in which States "historically have been sovereign" — the education field. *United States v. Lopez*, 514 U.S. 549, 564 (1995). In such areas, "it is insufficient merely that an agency reasonably liquidated ambiguities in the relevant statute"; rather, "Congress itself must have spoken with a 'clear voice.'" *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)); *see also D.G. ex rel. Stricklin v. Henry*, 594 F. Supp. 2d 1273, 1278 (N.D. Okla. 2009) (Congress must "speak with a clear voice" and manifest an "unambiguous" intent to confer individual rights before federal funding provisions will be read to provide a basis for private enforcement.).

112.    To the extent *Chevron* permits the Department's interpretation, that decision should be reconsidered. *Cf. Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. argued Jan. 17, 2024) (presenting question "[w]hether the Court should overrule *Chevron*).

113.    *Second*, the Department's reading of Title IX violates the principle that "[a]gencies are under an obligation to follow their own regulations, procedures, and precedents . . ." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002), *as modified on*

*reh'g*, 319 F.3d 1207 (10th Cir. 2003) Here, the Department has chosen to leave the 1975 regulations — allowing sex-separated "toilet, locker room, and shower facilities," among other things — on the books unchanged. *See* 89 Fed. Reg. at 33,816, 33,819, 33,820 (discussing 34 C.F.R. §§ 106.33-.34). But these regulations expressly contemplate and permit schools' dividing certain areas based on students' sex, not other characteristics like gender identity. The Department's gender-identity mandate thus conflicts with these regulations by rendering their core sex-based distinctions "meaningless." *Adams*, 57 F.4th at 813.

114.    Because the Department's interpretation of Title IX conflicts with the statutory text and operative regulations, it is not entitled to deference and exceeds the Department's legal authority to implement Title IX. The Final Rule therefore should be declared unlawful, "set aside," and vacated. *See* 5 U.S.C. § 706(2).

## CLAIM II
### Violation of APA, 5 U.S.C. § 706(2)(A), (B)
### Agency Action Contrary to the U.S. Constitution

115.    All allegations above are incorporated herein by reference.

116.    The APA requires courts to set aside and vacate agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also id.* § 706(2)(A); *Sierra Club*, 60 F.4th at 1021; *Long Island Power Auth.*, 27 F.4th at 717. The Final Rule is unconstitutional — and thus violates the APA — in multiple ways.

117.    *First*, if Title IX means what the Department says in the Final Rule, then Title IX's prohibition on sex discrimination transgresses the Spending Clause several times over. *See* U.S. Const. art. I, § 8, cl. 1.

118.    "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."

*Adams*, 57 F.4th at 815 (quoting *Pennhurst*, 451 U.S. at 17). That framework means that "if Congress intends to impose a condition on the grant of federal moneys [under its Spending Clause authority], it must do so unambiguously." *Id.* (quoting *Pennhurst*, 451 U.S. at 17); *see Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1250 (10th Cir. 2008). The Spending Clause "clear-statement rule" applies with particular force when a federal-funding condition "encroache[s] upon a traditional state power," such as the regulation of education. *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001); *see also Lopez*, 514 U.S. at 564.

119.    All agree that Congress passed Title IX "pursuant to its authority under the Spending Clause." *Adams*, 57 F.4th at 815. So, the Department can enforce the Final Rule's reading of Title IX against the States only if that reading is unambiguously directed by Title IX's text. *Id.* at 815-16. As the Eleventh Circuit correctly held in *Adams*, the Department's position does not clear that high hurdle. *Id.* at 816. At best, the text is ambiguous, and ambiguous statutes cannot support new duties on the part of Spending Clause recipients. *Id.* at 815–16; *accord Yellen*, 54 F.4th at 354 ("Congress *itself* must have spoken with a 'clear voice'" to satisfy the Spending Clause's clear-statement rule (quoting *Pennhurst*, 451 U.S. at 17)).

120.    The Final Rule also runs afoul of other Spending Clause limits. To start, given that Plaintiff Oklahoma's non-compliance threatens immense sums in federal monies distributed to State educational institutions — including some hundreds of millions to Oklahoma alone — the Rule unconstitutionally leaves Plaintiff Oklahoma with "no real option but to acquiesce" to the Department's interpretation, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78, 580–82 (2012) (opinion of Roberts, C.J., joined by Breyer & Kagan, JJ.). In addition, the Final Rule impermissibly conditions federal funding on States' and school recipients' taking unconstitutional actions against faculty and students for engaging in protected expression. *See South Dakota v.*

*Dole*, 483 U.S. 203, 210–11 (1987). Finally, extending Title IX's protections to individuals based on gender identity alone is not related, as it must be, to the statute's purpose of remedying past discrimination against women and promoting equal opportunity for women in education. *See South Dakota*, 483 U.S. at 207–08. For these additional reasons, the Final Rule unlawfully exceeds Congress's Spending-Clause power.

121.    *Second*, to the extent the Department asserts authority to define new "discriminatory practices" that violate Title IX exclusively "through [its] regulations," 89 Fed. Reg. at 33,517, 33,560, that position would transgress "the Constitution's rule vesting federal legislative power in Congress," not agencies acting by "pen-and-phone regulations." *West Virginia*, 597 U.S. 737, 753 (Gorsuch, J., concurring). Reading "sex" as a term capacious enough to encompass a controversial gender-identity mandate, among other novelties, would shift "unfettered" lawmaking power to the Department in a manner the nondelegation doctrine does not tolerate. *See Bridge on behalf of Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 WL 150598, at *8 (W.D. Okla. Jan. 12, 2024) ("At the time Title IX was enacted, the ordinary public meaning of "sex" was understood to mean the biological, anatomical, and reproductive differences between male and female. It is up to Congress to change that meaning, not this Court."); s*ee also Tiger Lily, LLC v. U. S. Dep't of Hous. & Urban Dev.*, 5 F.4th 666, 672 (6th Cir. 2021).

122.    *Third*, the Final Rule violates the First and Fourteenth Amendments to the U.S. Constitution. *See* U.S. Const. amends. I, XIV.

123.    To the extent the Biden Administration acts consistently with prior enforcement practice and interprets the Final Rule to compel school administrators and faculty to use gender-identity-based pronouns for a student, the Final Rule would violate the First Amendment. *Cf.*

*Davis*, 526 U.S. at 642–43, 650 (recognizing that a school's Title IX liability extends to sexual harassment of a student by teachers and peers). The First Amendment protects at least the rights of professors at public universities to decline to use pronouns inconsistent with the student's sex when teaching. *See Meriwether*, 992 F.3d at 498–500, 505. And disciplining a professor or other member of an educational community for failing to follow a school pronoun policy can violate the Free Exercise Clause. *Id.* at 512, 514. Either way, such an interpretation of the Final Rule would flout the First Amendment.

124.    The Final Rule's expansive definition of "hostile environment harassment" creates further First Amendment problems. 89 Fed. Reg. at 33,493, 33,884. Under the Final Rule, this concept covers all expression — even personal speech made in online forums off campus — that might "reasonably" be deemed "unwelcome" and that is so "severe" as to "limit" students' educational participation based on their sex. *Id.* at 33,535, 33,562, 33,884 (amending 34 C.F.R. § 106.02). But the Department then defines sex-based harassment to include harassment based on characteristics extending far beyond sex, including various "sex characteristics" and "gender identity." *Id.* at 33,756, 33,886 (34 C.F.R. §§ 106.02, .10). This broad framework inhibits First Amendment rights by chilling, or risking liability over, students' expression on deeply held views regarding significant moral and political issues.

125.    Additionally, by requiring school administrators to "respond promptly and effectively" to accommodate a student's stated gender identity, 89 Fed. Reg. at 33,533, 33,888 (amending § 106.444(a)), the Final Rule trespasses on the "substantive and procedural protection[s]" our Constitution extends to cover the right of parents to "[]bring [up]" their children as they deem fit. S*mith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)). The

Final Rule's statement that schools should defer to parental wishes about whether "to make a complaint" about or how "to address" sex discrimination is no answer. 89 Fed. Reg. at 33,821-22. That language does not purport to excuse schools from following the Final Rule's directive that sex discrimination encompasses gender-identity preferences, or otherwise state that parental opposition requires excepting students from Title IX's new reach.

126.    Because the Final Rule is unconstitutional in the ways discussed above, it should be declared unlawful, "set aside," and vacated. 5 U.S.C. § 706(2).

## CLAIM III
### Violation of APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action

127.    All allegations above are incorporated herein by reference.

128.    Federal law prohibits agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

129.    A federal agency acts in an "arbitrary and capricious" manner when it (1) "has relied on factors which Congress has not intended it to consider"; (2) "entirely fail[s] to consider an important aspect of the [regulatory] problem"; (3) "offer[s] an explanation for" its conduct "that runs counter to the evidence before" it; or (4) reaches a determination that "is so implausible … it could not be ascribed to a difference in view or … agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

130.    At least one court has noted the "usual 90 day" time period for comment once the proposed rule is published in the Federal Register. *See Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 453 (3d Cir. 2011). Here, the Department of Education denied requests for extensions and provided only thirty-two (32) days for comment. In adopting the Final Rule over commenters'

widespread opposition and decades of contrary practice, the Department has acted arbitrarily and capriciously.

131.    *First*, the Department fails to offer a "reasoned explanation" for the Final Rule's departure from the historic understanding of the meaning of Title IX's prohibition on "sex" discrimination, which regulations have codified since 1975. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). The Final Rule retreats from the reality-blinking statement that the Department "does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'" 87 Fed. Reg. at 41,537. Instead, citing *Bostock*, the Final Rule claims that the Department's interpretation is entirely consistent with reading "sex" to mean "biological sex." 89 Fed. Reg. at 33,802, 33,805. 251.

132.    *Bostock*, though, disclaimed that its reasoning "address[ed] bathrooms, locker rooms … or anything else of the kind." *Tennessee*, 615 F. Supp. 3d at 817 (quoting *Bostock*, 590 U.S. at 681). As the Sixth Circuit has held, and also recognized by Oklahoma courts, "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp., Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Bridge v. Okla. State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 WL 150598, at *6, n.1 (W.D. Okla. Jan. 12, 2024) (The Supreme Court made clear that its opinion did "not purport to address bathrooms, locker rooms, or anything else of the kind."); *Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 6516449, at *6 (N.D. Okla. Oct. 5, 2023). By definition, *Bostock* cannot excuse the inconsistency between the Department's longstanding view that enforcing sex-separation in spaces like bathrooms, locker rooms, and shower facilities is not sex discrimination, on the one hand, and its new rule deeming such policies actionable Title IX discrimination, on the other.

133.     Such "[u]nexplained inconsistency in agency policy is a reason for holding [the Department's] interpretation to be an arbitrary and capricious change." *Encino Motorcars*, 579 U.S. at 222 (cleaned up). Indeed, the Department's internally conflicting analysis suggests that the Final Rule's *Bostock*-based justifications for redrawing Title IX reflect "contrived reasons" offered to support a predetermined result: Effectuating President Biden's day-one directive to find new federal authority for adopting "prohibitions on sex discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. at 7,023 (capitalization altered); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

134.     *Second* and relatedly, the Department fails to "engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). This APA requirement means agencies cannot rest on "statements contradict[ing] earlier responses." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015).

135.     Yet the Department's stated reasoning offers "self-contradictory … logic" in spades. *Id.* at 16 (citation omitted). The Department points to Congress's allowing sex-separation in "living facilities" and 20 U.S.C. § 1681(1)-(9)'s exceptions as justification for omitting such facilities and programs from its gender-identity mandate. 89 Fed. Reg. at 33,816, 33,818-19. But the Department arbitrarily declines to extend the same treatment to bathrooms, toilets, and showers, which its regulations likewise permit to be separated based on sex. Nor can the Department identify a rational basis for allowing school activities and programs associated with Girls and Boys State to restrict participation based on sex, *see* § 1686(a)(7), yet requiring the participation of boys identifying as girls in sex-ed classes for girls. Nor can it explain why its "longstanding athletics regulations" support continuing to allow some (unspecified) enforcement

of sex-separate sports, 89 Fed. Reg. at 33,817, but the equally longstanding regulations governing bathrooms and locker rooms do not. Nor can the Department defend its assertion that consistently enforcing sex-separation policies based on persons' "physical differences" violates Title IX, since such differences underlie Title IX's entire statutory and regulatory scheme. *Id.* at 33,819.

136.     *Third*, the Department failed to adequately "consider and respond to significant comments received during the period for public comment" on the Final Rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Commenters raised a raft of concerns about the constitutional defects and compliance challenges attending the Final Rule's approach. But in response to many, the Final Rule offers only a "handful of conclusory sentences" and "unexplained inconsistencies." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated as moot*, 142 S. Ct. 1665 (Mem.) (2022); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not the hallmark of reasoned decisionmaking." *Gresham*, 950 F.3d at 103.

137.     Examples of the Department's flawed approach abound. The Final Rule claims "nothing in the[] regulations" conflicts with the First Amendment. *E.g.*, 89 Fed. Reg. at 33,500, 33,507, 33,535, 33,819. Yet it relies on Title VII EEOC harassment guidance that implicates freespeech rights on its face. The Final Rule defers consideration of constitutional concerns to future "technical assistance" documents, *id.* at 33,822, and enforcement actions, *id.* at 33,512, saying it can only address "specific examples" with future facts, *id.* at 33,509, 33,512. Yet elsewhere the Final Rule references examples provided for "illustrative purposes." *Id.* Regardless, promising to address future chaos does not adequately address the Final Rule's present legal problems. *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 476–77 (D.C. Cir. 2022).

138.     *Fourth*, the Department "entirely fail[s] to consider [certain] important aspect[s] of the problem" or address relevant evidence that "runs counter" to its cost-benefit determination. *State Farm*, 463 U.S. at 43. The Department altogether ignores States' practical concerns about authenticating gender identity, and likewise sidesteps commenters' objections that the Final Rule endangers privacy and safety interests. The Department rejects the view that the Final Rule will "lessen[] the force of Title IX's protections against discrimination that limits educational opportunities for girls and women," 89 Fed. Reg. at 33,808, ignoring the evidence that men identifying as women have already taken such opportunities from women. The Department fails to consider evidence of the biological differences between men and women that have long justified sex-separated facilities, certain sex-separated classes, and sex-separated sports. And the Department downplays the grave compliance challenges with structuring school operations based on internal notions of gender identity that are subjective and subject to change.

139.     For any and all of the preceding reasons, the Secretary's promulgation of the Final Rule was "arbitrary [and] capricious" and an "abuse of [agency] discretion," and the Rule should therefore be declared unlawful, "set aside," and vacated. 5 U.S.C. § 706(2).

### CLAIM IV
### Relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and 5 U.S.C. § 706
### Claim for Declaratory Judgment Against Defendants

140.     All allegations above are incorporated herein by reference.

141.     The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

142.     This case presents an actual controversy. The Final Rule operates on recipients of Title IX funds directly, meaning its requirements affect their legal rights. Moreover, the imminent enforcement of the Department's Final Rule threatens to force state recipients of Title IX funding to choose between violating Plaintiff's laws and abandoning consistent policies or losing its Title IX funding — funding that amounts to many millions annually.

143.     The controversy involves questions of federal law and thus arises in this Court's jurisdiction. Venue is proper, as the State of Oklahoma resides in this District.

144.     Through this Complaint, Plaintiff Oklahoma has filed an appropriate pleading to have its rights declared. The Court can resolve this controversy by declaring that Plaintiff Oklahoma has a right to Title IX funding notwithstanding state policies and legal directives that students participate in covered education programs and activities based on their sex, not gender identity.

## PRAYER FOR RELIEF

145.     An actual controversy exists between the Parties that entitle Plaintiff Oklahoma to declaratory and injunctive relief. This Court is authorized to award the requested vacatur and declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702, 705, and 706; 28 U.S.C. § 1361; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; Rules 57 and 65 of the Federal Rules of Civil Procedure; and the general and legal equitable powers of the Court. For these reasons, Plaintiff Oklahoma respectfully requests that the Court:

      a. Enter a stay of the Final Rule's effective date under 5 U.S.C. § 705 and a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing the portions of the Final Rule that violate Title IX, the APA, and the U.S. Constitution;

b.  Enter a judgment declaring, pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706, that (i) the Final Rule's interpretation of Title IX is unlawful; (ii) that the Final Rule is arbitrary and capricious; and (iii) that the Plaintiff, its political subdivisions, and its resident institutions may continue receiving Title IX funding notwithstanding any failure to adhere to the Final Rule's unlawful requirements;

c.  Set aside and vacate the Final Rule on the basis that it violates Title IX, the APA, and the U.S. Constitution, pursuant to 5 U.S.C. § 706;

d.  Permanently enjoin Defendants from withholding Title IX funding from Plaintiff, its political subdivisions, and resident institutions for refusing to comply with the Final Rule's unlawful requirements; and

e.  Award such other and further relief as this Court deems just and equitable.

Dated May 6, 2024.                         Respectfully submitted,


                                           *s/ Barry G. Reynolds*
                                           Garry M. Gaskins, II, OBA # 20212
                                           *Solicitor General*
                                           Zach West, OBA # 30768
                                           *Director of Special Litigation*
                                           OFFICE OF ATTORNEY GENERAL
                                           STATE OF OKLAHOMA
                                           313 N.E. 21st St.
                                           Oklahoma City, OK 73105
                                           Phone: (405) 521-3921
                                           Garry.Gaskins@oag.ok.gov
                                           Zach.West@oag.ok.gov

                                           AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax:    (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*