**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1.  STATE OF OKLAHOMA<br><br>                     *Plaintiff*,<br><br>v.<br><br>1.  MIGUEL CARDONA, in his official capacity as the Secretary of Education for the United States Department of Education;<br><br>  and<br><br>2.  UNITED STATES DEPARTMENT OF EDUCATION;<br><br>                 *Defendants*. | Case No. CIV-24-0461-JD |

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND OPENING BRIEF IN SUPPORT**

June 28, 2024

Submitted by:

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
(918) 587-6800  Fax:  (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................... 1

**BACKGROUND AND STATEMENT OF FACTS** ........................................... 1

    I.    Title IX History.......................................................................................... 1

    II.   Regulatory Background, Rulemaking, and Context................................... 2

    III.  Oklahoma's Comment and Oklahoma State Law .................................... 6

    IV.  The Final Rule .......................................................................................... 6

    V.   Related Cases ............................................................................................ 9

**ARGUMENTS AND AUTHORITIES** ........................................................... 11

    I.    THE FINAL RULE VIOLATES THE U.S. CONSTITUTION. ........................ 12

        A.  The Final Rule Violates the Spending Clause............................... 12

        B.  The Final Rule Violates the Tenth Amendment. ......................... 14

    II.   THE FINAL RULE IS CONTRARY TO LAW AND EXCEEDS STATUTORY
        AUTHORITY. ...................................................................................... 15

        A.  The Final Rule's Expansive View of "Sex" Contravenes the Title IX Statute
            and Attempts to Resolve a Major Question Without Clarity. ..................... 15

        B.  The Final Rule's Harassment Standard is Contrary to Title IX. ................ 20

    III.  THE FINAL RULE IS ARBITRARY AND CAPRICIOUS. ............................. 23

    IV.  OKLAHOMA FACES IRREPARABLE HARM. ............................................... 27

    V.   THE THREATENED HARM TO OKLAHOMA EXCEEDS ANY INJURY
        DEFENDANTS COULD FACE, AND THE REQUESTED INJUNCTION IS IN
        THE PUBLIC INTEREST. ...................................................................... 29

    VI.  OKLAHOMA REQUESTS AN EXPEDITED RULING................................... 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022).................... 12, 13, 16

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021).............. 20

*Arbogast v. Kansas, Dep't of Lab.*, 789 F.3d 1174 (10th Cir. 2015) ............................... 12

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ................................................................. 11

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020)....................................................*passim*

*Bridge v. Oklahoma State Dep't of Educ.*, No. CIV-22-00787-JD, 2024 WL 150598
     (W.D. Okla. Jan. 12, 2024) ................................................................................*passim*

*Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445 (5th Cir. 2020) ................... 16

*Cloud Peak Energy Inc. v. United States Dep't of Interior*, 415 F. Supp. 3d 1034
     (D. Wyo. 2019).................................................................................................... 28

*Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034 (D. Colo. 2020)....................... 12

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ............................ 12, 21, 22, 28

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015)............... 25

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019)....................... 30

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ......................................................... 24

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) ............................. 26

*Doe v. Univ. of Denver*, 952 F.3d 1182 (10th Cir. 2020).................................................... 9

*Elwell v. Oklahoma*, 693 F.3d 1303 (10th Cir. 2012) ....................................................... 15

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)................................................. 23

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)................................. 20

*Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246 (2009) ........................................... 9

*Fowler v. Stitt*, 2024 WL 3035712 (10th Cir. 2024) ......................................... 19

*Gaines et al. v. NCAA, Compl.*, 2024 1:24-cv-01109-MHC (N.D. Ga. 2024) ................. 27

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) ................................................. 26

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ............................... 18

*King v. Burwell*, 576 U.S. 473 (2015) ............................................................. 20

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ............................................................. 17

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ...................... 30

*Louisiana v. U.S. Dept. of Educ.*, No. 3:24-CV-00563; 2024 WL 2978786
   (W.D. La. June 13, 2024) ...................................................................... *passim*

*Michigan v. EPA*, 576 U.S. 743 (2015) ............................................................. 25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................... 23, 26

*Neese v. Becerra*, 2:21-CV-163-Z, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ........ 14

*Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023) ................................................ 15

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ............................... 30

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ...................... 12

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ........................................ 26

*Perrin v. United States*, 444 U.S. 37 (1979) ................................................. 16

*Petrey v. Flaugher*, 505 F. Supp. 1087 (W.D. Ky. Jan. 28, 1981) .................... 15

*Poe v. Drummond,* No. 23-CV-177-JFH-SH, 2023 WL 6516449
   (N.D. Okla. Oct. 5, 2023) ...................................................................... 18

*Prometheus Radio Project v. F.C.C.*, 652 F.3d 431 (3d Cir. 2011) ................................. 23

*Sandusky v. Smith*, No. 3:10-CV-00246-H; 2012 WL 4592635
  (W.D. Ky. Oct. 2, 2012) ............................................................................ 15

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ................................ 22

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020)......................................... 22

*Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480 (S.D. Tex. 2022) ............................ 22

*Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022)....................................................... 16

*Tennessee v. U.S. Dep't of Educ.*, No. 22-5807, 2024 WL 2984295
  (6th Cir. 2024) ............................................................................ 5, 9, 24, 30

*Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022)...................... 9

*Texas v. Cardona*, No. 4:23-cv-00604-O, 2024 WL 2947022
  (N.D. Tex. June 11, 2024) .......................................................................... 13

*Texas v. United States,* 201 F. Supp. 3d 810 (N.D. Tex. 2016) ......................................... 3

*Texas v. United States*, No. 7:16-cv-00054-O, 2016 WL 7852331
  (N.D. Tex. Oct. 18, 2016)........................................................................... 3

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) ...................................................... 30

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) .................................................. 28

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................................ 15

*West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124
  (11th Cir. 2023) .................................................................................. 13, 30

*West Virginia v. EPA*, 597 U.S. 697 (2022) .................................................................. 20

*Wis. Cent. Ltd. v. United States*, 585 U.S. 274 (2018) .................................................... 16

## US CONSTITUTIONAL PROVISIONS

Article I § 8 ............................................................................................................... 12

## STATUTES

5 U.S.C. § 705 ................................................................................................. 11

5 U.S.C. § 706, *et seq.* ....................................................................... 11, 15, 23, 27

20 U.S.C. § 1681, *et seq.* .................................................................................. *passim*

20 U.S.C. § 1682 ............................................................................................ 2, 29

42 U.S.C. § 2000e-2(a)(1) ................................................................................ 18

Okla. Stat. tit. 70, § 24-157 ............................................................................. 28

Okla. Stat. tit. 70, § 27-106 ...................................................................... 6, 14, 28

Okla. Stat. tit. 70, § 3101, *et seq.* ................................................................... 29

## REGULATIONS

34 C.F.R. § 106, *et seq.* ................................................................... *Passim*

Okla. Admin. Code. § 210:10-1-23 ................................................................. 28

## OTHER AUTHORITIES

40 Fed. Reg. 24,132-24,135 ............................................................................. 17

85 Fed. Reg. 30,026 .......................................................................................... 4

85 Fed. Reg. 30,178 ..................................................................................... 4, 14

86 Fed. Reg. 7,023 .......................................................................................... 24

86 Fed. Reg. 13,803 .......................................................................................... 5

87 Fed. Reg. 41,537 ......................................................................................... 24

88 Fed. Reg. 22,860 ..................................................................................... 5, 23

89 Fed. Reg. 33,474 ...................................................................................... 1, 6

89 Fed. Reg. 33,493 .......................................................................................... 7

89 Fed. Reg. 33,516 ........................................................................................ 21

89 Fed. Reg. 33,530 ........................................................................................ 22

89 Fed. Reg. 33,802-33,805 .................................................................. 7, 14, 24

89 Fed. Reg. 33,808 ........................................................................................ 27

89 Fed. Reg. 33,816-33,819 ........................................................... 7, 25, 26, 27

89 Fed. Reg. 33,884-33,886 .......................................................................... 7, 21

Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484,
    § 612 (1974) ............................................................................................. 2

## INTRODUCTION

The U.S. Department of Education (the "Department" or "DOE") is attempting to rewrite the historic goals and fundamental requirements of Title IX of the Educational Amendments Act of 1972. Title IX ensures equal opportunity for females, athletes and otherwise, by barring schools receiving federal funds from discriminating "on the basis of sex." The Department, however, seeks to fundamentally alter the protections afforded to women under Title IX by inserting "gender identity" into the framework for determining, among other things, access to a restroom and a student's eligibility to participate on a sports team. State recipients like Oklahoma that have conflicting state laws will face enforcement actions and the loss of federal education funding unless those states comply with the DOE's Final Rule published on April 29, 2024. *See* 89 Fed. Reg. 33474 (the "Final Rule").

The State of Oklahoma seeks a preliminary injunction or stay barring the Final Rule from going into effect on August 1, 2024. Such an injunction is clearly warranted as a matter of law, as at least one other court has already recognized. *See Louisiana v. U.S. Dept. of Educ.*, No. 3:24-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024) (enjoining the Final Rule for Louisiana, Mississippi, Montana, and Idaho).

## BACKGROUND AND STATEMENT OF FACTS

### I.      Title IX History

1.      More than half a century ago, in 1972, Congress enacted Title IX to promote equal opportunity for males and females in education. *See* 20 U.S.C. § 1681(a). As such, "[n]o person in the United States shall, on the basis of *sex*, be excluded from participation

in, be denied the benefits of, or be subject to discrimination under any educational programs or activity receiving Federal financial assistance." *Id.* (emphasis added).

2.     Although Title IX did not originally reference athletics, Congress later amended the statute to do so. *See* Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, § 612 (1974). This amendment required regulations "implementing [Title IX's] provisions[,] . . . includ[ing,] with respect to intercollegiate athletic activities[,] reasonable provisions concerning the nature of particular sports." *Id.* The text of the corresponding regulation now requires an "equal athletic opportunity for members of both sexes," and refers to those two sexes as "male" and "female." 34 C.F.R. § 106.41(c); 20 U.S.C. § 1681(a)(7). Congress also authorized federal agencies to enforce Title IX's requirements by issuing rules, regulations, and orders requiring compliance with Title IX's mandate and authorized agencies to terminate a non-compliant recipient's Title IX assistance. *See* 20 U.S.C. § 1682.

## II.     Regulatory Background, Rulemaking, and Context

3.     Decades of administrative interpretations after Title IX was enacted confirmed Title IX's requirement that sports, locker rooms, and the like be kept separate for each sex. *See, e.g.*, 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."). The Department shifted its interpretation during the Obama Administration, however, when it advised in 2014 that "Title IX's sex discrimination prohibition extends to claims of

discrimination" based solely on "gender identity."[1] The Department doubled down on its new interpretation in a subsequent letter asserting that Title IX "encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status."[2] The guidance failed to square the Department's new interpretation with its previous interpretation of "sex." Nor did it offer any legal analysis supporting the new interpretation. Instead, it asserted that a recipient would discriminate "on the basis of sex" if it failed to "treat students consistent with their gender identity," even if a student's gender identity conflicted with his or her sex.

4.     The Department also suggested that a recipient's failure to compel faculty and staff to "use pronouns and names consistent with a transgender student's gender identity" could violate its new view of Title IX.[3] A recipient would also engage in sex discrimination under the Department's reading if it failed to permit students to access restrooms, locker rooms, showers, and housing, or if the recipient failed to allow students to participate in activities, including sports, based on their gender identity alone. *Id.* at 3-4.

5.     A federal court in Texas enjoined the enforcement of the Department's interpretation nationwide. *See Texas v. United States*, 201 F. Supp. 3d 810, 816 n.4, 836 (N.D. Tex. 2016), *clarified by*, No. 7:16-cv-00054-O, 2016 WL 7852331 (N.D. Tex. Oct.

---

[1] U.S. Dept. of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014) (rescinded in 2017), https://bit.ly/44ixq2u.
[2] U.S. Dep't of Just. & U.S. Dep't of Educ., Off. for Civ. Rights, *Dear Colleague Letter on Title IX and Transgender Students*, at 1 (May 13, 2016) (rescinded in 2017), https://perma.cc/G5VG-ZNV9; *see also* U.S. Dep't of Educ., Off. for Civ. Rights, *Letter to Emily T. Prince, Esq.*, at 1-2 (Jan. 7, 2015) (rescinded in 2017), https://perma.cc/4ZRV-8LQ7 (previewing this position).
[3] *Dear Colleague Letter on Title IX and Transgender Students supra*, note 2, at 3.

18, 2016). The court held that the plaintiffs would likely succeed on the merits in arguing: (a) that the Department violated the APA's notice and comment requirements by adopting "legislative and substantive" rules in the guise of guidance, and (b) that the ordinary public meaning of "sex" as used in Title IX unambiguously precluded construing that term to mean "gender identity." *Id.* at 827–34. The plaintiffs voluntarily dismissed their suit after the guidance was withdrawn during the subsequent administration.

6.      Thereafter, the Department initiated a round of notice-and-comment rulemaking, after publishing a comprehensive set of regulations governing recipients' obligations to prevent sex discrimination in their programs and activities. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (the "2020 Regulations"). The 2020 Regulations took effect on August 14, 2020. *Id.*

7.      The 2020 Regulations addressed the question of whether discrimination "on the basis of sex" encompassed sexual orientation and gender identity. Although the Department declined to define "sex" in the 2020 Regulations because it was not necessary to effectuate the rules and would have consequences that extended outside of the proposed rulemaking, the Department observed that "Title IX and its implementing regulations include provisions that presuppose sex as a binary classification." It further explained that "provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition." 85 Fed. Reg. at 30,178.

8.      After his election, President Biden issued an executive order charging the Secretary of Education to review "all existing regulations, orders, guidance documents,

policies, and any other similar agency actions" for consistency with his administration's new Title IX policy.[4] In that executive order, President Biden presupposed that "on the basis of sex" included sexual orientation and gender identity. *Id.* The Department thus conducted its review and subsequent rulemaking with the intention of effectuating President Biden's instruction that Title IX should be interpreted as encompassing gender identity notwithstanding decades of precedent to the contrary. Doubling down on President Biden's new interpretation, in 2021 the Department issued three "guidance" documents explaining that the Department would "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." *Tennessee v. U.S. Dep't of Educ.*, --- F.4th ----, 2024 WL 2984295, at * 2 (6th Cir. 2024). Oklahoma successfully challenged these guidance documents as unlawfully issued. *Id.* at *22-27.

9.     On April 13, 2023, the Department published in the Federal Register a notice of proposed rulemaking to amend regulations implementing Title IX "to set out a standard that would govern a recipient's adoption or application of sex-related criteria that would limit or deny a student's eligibility to participate on a male or female athletic team consistent with their gender identity." *See* Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (April 13, 2023).

---

[4] Executive Order 14021, 86 Fed. Reg. 13,803 (Mar. 8, 2021), http://bit.ly/4aWLPUI.

### III.    Oklahoma's Comment and Oklahoma State Law

10.    Oklahoma submitted a comment (attached as Exhibit 1) before the comment period for the proposed rule closed on May 15, 2023. In its comment, Oklahoma argued that the Proposed Rule erroneously relied on *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020), ignored Title IX's specific language, and would harm and restrict the entire class of individuals that Title IX originally sought to build up and protect: female athletes.

11.    Oklahoma further explained how the proposed rule was in direct violation of the Tenth Amendment and Oklahoma's Save Women's Sports Act ("Act"). As set out in that Act, "[p]rior to the beginning of each school year, the parent or legal guardian of a student who competes on a school athletic team shall sign an affidavit acknowledging the *biological sex* of the student at birth." Okla. Stat. tit. 70, § 27-106(D) (emphasis added). Female athletic teams "shall not be open to students of the male sex." § 27-106(E)(1). And "[a]ny student who is deprived of an athletic opportunity or suffers any direct or indirect harm as a result of a violation of [§ 27-106(E)(1)] shall have a cause of action for injunctive relief, damages and other relief … against the school." § 27-106(E)(2).

### IV.    The Final Rule

12.    Despite widespread opposition throughout the notice and comment period, the Department published the Final Rule in the Federal Register on April 29, 2024. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106, *et seq.*). The Final Rule is scheduled to take effect on August 1, 2024. *Id.*

6

13.     If allowed to take effect, the Final Rule will fundamentally alter the meaning of Title IX's bar on sex discrimination. It declares that "sex" is an expansive concept with boundaries that do not need to be defined. Instead, in the Department's view, unlawful "sex discrimination" under Title IX covers "any discrimination that depends" even "in part on consideration of a person's sex," 89 Fed. Reg. at 33,803, including "discrimination on the basis of … gender identity," *id.* at 33,886 (to be codified at 34 C.F.R. § 106.10).

14.     The Final Rule compounds the Department of Education's erroneous interpretation of sex discrimination by adopting an expansive definition of what constitutes prohibited "harassment" for Title IX purposes. Under the Final Rule, "harassment" includes any speech or expression that might reasonably be deemed "unwelcome," "offensive," and "limit[ing]" of a student's educational participation or benefits. 89 Fed. Reg. at 33,493, 33,884 (amending 34 C.F.R. § 106.2). The Final Rule purports to preempt all "State or local laws or other requirements" that conflict with its terms (89 Fed. Reg. at 33,885), and it applies to any school "program or activity" regardless of whether the activity occurs within the school. 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.11).

15.     The DOE threatens to withhold federal funding from schools that do not allow students access to "restrooms and locker rooms" based on gender identity. *See, e.g.*, 89 Fed. Reg. at 33,816. The Final Rule dictates that a school violates Title IX if a transgender student is denied access to a bathroom or locker room of the opposite biological sex. *See, e.g.*, 89 Fed. Reg. at 33,818.

16.    In Oklahoma, there are 1,805 public school sites serving primary and secondary school-aged children.[5] In 2023, the federal government allocated $224,659,304 to the Oklahoma State Department of Education to fund Oklahoma schools.[6] All these schools receive federal funds, and thus, are Title IX recipients.[7]

17.    Public and special schools in Oklahoma use such federal funds to provide supplemental educational support and materials to students, offer non-academic support for students, provide professional learning opportunities for teachers, offer technology for student use, and for other purposes.[8] Losing these funds will require these schools to eliminate certain services or seek new funding, with no guarantee of success.

18.    Oklahoma is also home to forty-nine (49) public colleges and universities benefiting higher education.[9] All post-secondary education programs received

---

[5] Okla. Dept. of Educ., Oklahoma Public Schools: Fast Facts 2021-22, https://sde.ok.gov/sites/default/files/documents/files/Fast%20Facts%202021-22.pdf (last visited June 27, 2024).

[6] Off. of Elementary & Secondary Educ., Funding Status & Awards, Dept. of Educ. (July 7, 2023), https://oese.ed.gov/offices/office-of-formula-grants/school-support-and-accountability/title-i-part-a-program/funding-status/.

[7] *See* U.S. Dept. of Educ., Fiscal Years 2023-2025 State Tables for the U.S. Dep't of Educ., State tables by State, https://www2.ed.gov/about/overview/budget/statetables/25stbystate.xlsx (last visited June 27, 2024); *see also* Title IX and Sex Discrimination, Dept. of Educ. (Aug. 2021), https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html ("Title IX applies to schools, local and state educational agencies, and other institutions that receive federal financial assistance from the Department.")

[8] Okla. State Dept. of Educ., Sources of Revenue State Aid Formula Penalties/Adjustments (Nov. 2023), https://sde.ok.gov/sites/default/files/FY%202024%20TAD%20no%20comments%20%20 11.22.2023.pdf.

[9] *See* Okla. State Regents for Higher Educ., About the State System of Higher Education, https://okhighered.org/state-system/colleges-universities/list/ (last visited June 14, 2024).

approximately $350 million in federal funds in Fiscal Year 2022-23, subjecting them to Title IX.[10] These postsecondary institutions use federal funds for many purposes, including student loans, student grant aid, research and service, and veterans' affairs.[11] Losing Title IX funds will require those institutions to eliminate certain educational services or seek new funding. Additionally, students who rely on federal funds to attend those institutions might have their education interrupted, resulting in disenrollment or abandonment of a degree or other program. Title IX also applies to most private universities. "Title IX reaches institutions and programs that receive federal funds, which may include nonpublic institutions." *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 257 (2009); *see also* 20 U.S.C. §§ 1681(a) & (c); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189–90 (10th Cir. 2020).

### V.   Related Cases

19.     Again, Oklahoma has already obtained one injunction of the Biden Administration's attempt to force these interpretations upon Title IX. In *Tennessee v. U.S. Dep't of Educ.*, the district court prohibited the federal government from enforcing, against Oklahoma, its "guidance documents" interpreting Title IX to include gender identity. 615 F. Supp. 3d 807 (E.D. Tenn. 2022). The government, the court found, failed to go through the appropriate notice-and-comment process required by the Administrative Procedures Act ("APA"). The government appealed to the Sixth Circuit, which just affirmed the injunction. *See Tennessee*, 2024 WL 2984295. To be sure, the Final Rule did include a

---

[10] Fiscal Years 2023-2025 State Tables for the U.S. Dep't of Educ., *supra* note 7.
[11] *Id.*

notice-and-comment element, making this injunction inapplicable here. That said, it is telling that the federal government first tried to force its wayward Title IX interpretations on the public *without* taking the public's views into account.

20.     In *Bridge v. Oklahoma State Department of Education*, this Court held that Oklahoma's law (S.B. 615) delineating school restrooms based on sex did not discriminate against transgender students in violation of Title IX. *See* No. CIV-22-00787-JD, 2024 WL 150598 (W.D. Okla. Jan. 12, 2024). When Title IX was enacted, this Court observed, "'sex' was defined by biology and reproductive functions." *Id.* at *7. Moreover, this Court found that "the text of Title IX … is different than that of Title VII," it expressly protects separate facilities, and thus "Oklahoma's law is perfectly in sync with Title IX." *Id.* In doing so, this Court rejected "the view that gender identity is synonymous with biological sex or that biological sex is a stereotype." *Id.*, n. 11.

21.     Finally, various lawsuits have been filed around the country against the Final Rule. Already, one court has granted a preliminary injunction. *See Louisiana*, 2024 WL 2978786. That court declared, in granting several states' motion for a preliminary injunction, that "[t]his case demonstrates the abuse of power by executive federal agencies in the rulemaking process" and that "[t]he separation of powers and system checks and balances exist in this country for a reason[]" because "[t]he abuse of power by administrative agencies is a threat to democracy." *Id.* at *20. More particularly, the court found that the Final Rule is contrary to Title IX, and in doing so rejected the argument that *Bostock* applies to Title IX. *Id.* at *10-12. The court further found that the harassment standard in the Final Rule is likely contrary to Title IX and violates the First Amendment,

*id.* at \*12-13, that the Final Rule likely violates the major questions doctrine and the Spending Clause, *id.* at \*13-16, and that the Final Rule is arbitrary and capricious. *Id.* at \*16-19. Given that the States were likely to succeed on the merits, that they would be harmed by the Final Rule, and the public interest was in favor of the States, the Court issued its injunction. *Id.* at \*9-21.

## ARGUMENTS AND AUTHORITIES

To obtain a preliminary injunction, Oklahoma must show that: (1) it is likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any injury to the opposing party; and (4) the injunction is not against the public interest. *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). Oklahoma meets all four requirements, and this Court should issue an injunction. Alternatively, this Court should postpone the effectiveness of the Final Rule. *See* 5 U.S.C. § 705.

Under the APA, courts are entitled to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Courts may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." *Id.*

Here, the Final Rule runs afoul of the United States Constitution, as well as Title IX, and it should be set aside. Likewise, the Final Rule failed to observe procedure required by law and should additionally be enjoined from going into effect under the APA.

11

## I.  THE FINAL RULE VIOLATES THE U.S. CONSTITUTION.

### A.  The Final Rule Violates the Spending Clause.

Congress enacted Title IX pursuant to its powers under the Spending Clause. *See Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 640 (1999). The Spending Clause provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to … provide for the … general Welfare of the United States . . . ." U.S. Const. art. I, § 8, cl. 1. If Congress intends to impose a condition on the grant of federal funding under the Spending Clause, it must do so "unambiguously" and with "a clear voice." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); s*ee also Arbogast v. Kansas, Dep't of Lab*., 789 F.3d 1174, 1186 (10th Cir. 2015) (recognizing four limitations on Spending Clause legislation). A clear statement is required when imposing a condition on federal funding because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Adams v. Sch. Bd. of St. Johns Cnty*., 57 F.4th 791, 815 (11th Cir. 2022) (citing *Pennhurst*, 451 U.S. at 17).

Federal agencies cannot impose requirements that Congress did not consider or impose itself. "[A]gency-imposed grant conditions, even if they themselves are unambiguous, cannot be constitutional under the Spending Clause unless the statute from which they originate is also unambiguous." *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034, 1056 (D. Colo. 2020). That is to say, conditions imposed by an agency on grant funding cannot have been unambiguously authorized by Congress when the conditions

were never statutorily authorized to begin with. *Id.* at 1056-57; *see also West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (stating that "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare"). "Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'" *Morrisey*, 59 F. 4th at 1147 (citations omitted). "Therefore, the 'needed clarity' under the Spending Clause 'must come directly from the statute[,]'" not from Defendants' after-the-fact regulations. *Id.* (citations omitted).

Congress did not unambiguously intend for discrimination prohibited under Title IX to extend to discrimination on the basis of gender identity, as the Department seeks to insert into 34 C.F.R. § 106.10. *See Texas v. Cardona*, Civil Action No. 4:23-cv-00604-O, 2024 WL 2947022, at *42 (N.D. Tex. June 11, 2024) (finding that "Title IX *itself* fails to provide clear notice of Defendants' proposed requirements" and that "Title IX does not unambiguously prohibit discrimination based on sexual orientation or gender identity.") As this Court found in *Bridge*, at the time Title IX was enacted, the use of the word "sex" in Title IX was limited to the two biological sexes. In *Adams*, the Eleventh Circuit observed that "schools across the country separate bathrooms based on biological *sex*;" "colleges and universities across the country separate living facilities based on biological *sex*;" and schools, colleges, and universities separate athletic teams based on biological *sex*. *Adams*, 57 F.4th at 816-17. The Final Rule therefore "call[s] into question the validity" of all these practices that are at the core of Title IX. *Id.* at 817. It "is untenable" that states, schools,

13

colleges, or universities "could or should have been on notice" that these practices violate Title IX. *Id.* at 816. Simply put, the Eleventh Circuit "read 'sex' in Title IX to mean 'biological sex,' as we must." *Id.* at 815. Moreover, the Department of Education has previously confirmed it viewed Title IX the same way, since its longstanding interpretation of Title IX and regulations "include provisions that presuppose sex as a binary classification." 85 Fed. Reg. at 30,178.

Critically, in the Final Rule, Defendants admit that Congress did not address gender identity discrimination in Title IX. "Congress has not amended Title IX to *clarify* its application to sexual orientation and gender identity discrimination." 89 Fed. Reg. at 33,805 (emphasis added). This statement is dispositive under the Spending Clause, which requires such clarity. "Legislators tried to amend Title IX to include 'sexual orientation' and 'gender identity' on multiple occasions, but those attempts failed." *Neese v. Becerra*, 2:21-CV-163-Z, 2022 WL 1265925, at *13 (N.D. Tex. Apr. 26, 2022). Since Congress has not spoken with respect to whether Title IX addresses discrimination on the basis of gender identity, the Final Rule violates the Spending Clause. *See Louisiana*, 2024 WL 2978786, at *14-15 (finding the Final Rule violates the Spending Clause in part because when Title IX was enacted, "'sex discrimination' only referred to biological women and men").

**B. The Final Rule Violates the Tenth Amendment.**

The Final Rule usurps authority that belongs to the States. It violates the Tenth Amendment of the Constitution by attempting to expand into the scholastic realm issues that must be left to the states and boards of education. Specific to Oklahoma, the Final Rule directly conflicts with the aforementioned law delineating Oklahoma school restrooms

based on sex, as well as the "Save Women's Sports Act." *See* Okla. Stat. tit. 70, § 27-106. The decisions of states on education should be undisturbed by the federal system unless the state's action is "clearly unconstitutional." *See Sandusky v. Smith*, No. 3:10-CV-00246-H, 2012 WL 4592635, at *8 (W.D. Ky. Oct. 2, 2012) (quoting *Petrey v. Flaugher*, 505 F. Supp. 1087, 1090 (W.D. Ky. Jan. 28, 1981)). Here, the Final Rule interferes with States' long-standing authority in education.

## II.   THE FINAL RULE IS CONTRARY TO LAW AND EXCEEDS STATUTORY AUTHORITY.

### A.   The Final Rule's Expansive View of "Sex" Contravenes the Title IX Statute and Attempts to Resolve a Major Question Without Clarity.

Because the Final Rule is contrary to Title IX's text and structure, and Defendants have no statutory authority to subvert Title IX or decide major questions unilaterally, Oklahoma is likely to succeed in showing that the Rule is "not in accordance with law" and exceeds statutory authority. 5 U.S.C. § 706(2)(A), (C). All the tools of statutory interpretation support reading Title IX as barring discrimination based on sex, biologically understood, not the distinct term "gender identity" and associated theories. *See Bridge*, 2024 WL 150598, at *4, n. 5; *see also Elwell v. Oklahoma*, 693 F.3d 1303, 1313 (10th Cir. 2012) (discussing traditional rules of statutory construction); *Ohio v. Becerra*, 87 F.4th 759, 769 (6th Cir. 2023) (similar). The Department of Education does not have the authority to "rewrite clear statutory terms," much less rewrite terms in a way that undercuts a statute's purpose. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Yet that is exactly what the Final Rule does by interpreting "sex" in Title IX to embrace "gender identity" and other concepts that are distinct from biological sex when the term "sex" in

15

Title IX means biological sex. The Rule is therefore contrary to law and exceeds statutory authority.

Again, Title IX provides:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).

When construing a statute, a court's "job is to interpret the words consistent with their 'ordinary meaning' . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). That means "look[ing] to dictionary definitions for help in discerning a word's ordinary meaning," *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020), and reading the word in context, "not in isolation*," Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022); *see also Bridge*, 2024 WL 150598, at *7.

Again, this Court already found that when Title IX was enacted in 1972, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females—particularly with respect to their reproductive functions." *Bridge,* 2024 WL 150598, at *7 (collecting examples) (citation omitted)); *see also Adams,* 57 F.4th at 812 (stating that "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females").

Furthermore, longstanding regulations—including regulations adopted soon after Title IX's enactment and with congressional approval—have consistently interpreted "sex" in Title IX to mean biological sex. *See, e.g.,* 40 Fed. Reg. at 24,132 ("either sex"); *id.* at 24,135 ("male and female"); *id.* (referring to "one sex" and "the opposite sex"); 34 C.F.R. § 106.33 (referring to "one sex" and "the other sex"); *id.* § 106.41(c) (referring to "both sexes" and "male and female teams"). This is determinative and "powerful evidence" of the "original public meaning" of Title IX. *See Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring) (emphasis omitted).

This treatment of "sex" as a male-female binary reflects Title IX's linguistic context. "The phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications."[12] And the word "gender" had itself "been coined only recently in contradistinction to sex." *Id.* These textual, structural, and linguistic clues accord with the evidence that Congress enacted Title IX with a sex-specific purpose: to remedy discrimination against women in American education and sports by promoting equal opportunities for them going forward.

Defendants' reliance on *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020), as a basis to redefine sex discrimination under Title IX, is misplaced. *See Texas*, 2024 WL 2947022, at *37 (finding that the Department's reliance on *Bostock* "falls flat"). Put simply, *Bostock* does not support the Final Rule because it involves a different statute, different

---

[12] Ryan T. Anderson & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do*, at 9, The Heritage Found. (2017), https://perma.cc/VG5N-ZAYE.

language, a different group of individuals, and different factual groundwork. *See generally id.* The Supreme Court has made this clear: "Title VII is a vastly different statute" than "Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 168 (2005). In *Bostock*, the Supreme Court addressed Title VII only, holding merely that an employer cannot take adverse employment actions because of an individual's sexual orientation or gender identity. 544 U.S. at 657-58. Moreover, even in *Bostock*, the Supreme Court's decision was based on the assumption that "sex" referred "only to biological distinctions between male and female." *Id.* at 655. It also stated that "transgender status" is a "distinct concept[] from sex." *Id.* at 668-674.

*Bostock*'s rationale was that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656 (citation omitted). Title IX does not use the "because of sex" language or incorporate a "but-for" standard like Title VII. Instead, Title IX's statutory language prohibits discrimination "on the basis of sex." *See* 20 U.S.C. § 1681(a). That is to say, *Bostock* neither discussed nor ruled on Title IX's dissimilar phraseology: "on the basis of sex." Despite this, Defendants erroneously blend Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), with Title VII's prohibition on discrimination "because of … sex," 42 U.S.C. § 2000e-2(a)(1)— two distinct analyses. Furthermore, *Bostock* explicitly refrained from addressing gender identity in any other context than Title VII. *See* 544 U.S. at 681 (stating that it would not "address bathrooms, locker rooms, or anything else of the kind*"); see also Bridge*, 2024 WL 150598, at *6, n.1 (citing this language); *Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 6516449, at *6 (N.D. Okla. Oct. 5, 2023). Rather, the Court in *Bostock* expressly

declared that "none of these other laws are before us . . . and we do not prejudge any such question today." 544 U.S. at 681. In sum, *Bostock* did not prejudge nor interpret Title IX. *Bostock* is therefore irrelevant to the interpretation or rulemaking of Title IX.[13]

In comparison to Title VII, protecting women under Title IX is carried out by schools *specifically accounting for* a student's biological sex. In other words, Title IX *allows* schools to draw sex-based distinctions. It permits schools to provide "Boy or Girl conferences," and "[f]ather-son or mother-daughter activities." 20 U.S.C. § 1681(a)(7)–(8). Separate sports teams are created under the rules to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(b)–(c). Such practices under Title IX have stood for more than fifty years. Thus, the Department, in enacting the Final Rule, cannot rely on *Bostock* when it is directly disputed by statutory authority, statutory language, and the group of individuals in which the statute is designed to protect—workplace employees versus women in education and athletics. The Department of Education's Final Rule is redefining sex without *any* authority to do so. *See Louisiana*, 2024 WL 2978786, at *11 (finding that "Defendants use of *Bostock*'s interpretation of 'sex' to Title IX would essentially reverse the entire premise of Title IX, as it would literally allow biological males to circumvent the purpose of allowing biological females to participate in sports that they were unable to participate in prior to 1975"); *Texas*, 2024 WL 2947022, at *29 (the

---

[13] The Tenth Circuit's recent opinion in *Fowler v. Stitt*, 2024 WL 3035712 (10th Cir. 2024), does not require holding otherwise, since *Fowler* is also not a Title IX case. There is no binding Tenth Circuit authority applying *Bostock* to Title IX, and indeed, this Court has already rejected the view that "gender identity is synonymous with biological sex" in the context of Title IX. *Bridge*, 2024 WL 150598, at *7, n.11.

"Department lacks the authority to 'rewrite clear statutory terms to suit its own sense of how the statute should operate,' particularly in a way that undercuts a statute's purpose").

Further, courts will not assume that Congress has assigned questions of "deep economic and political significance" to an agency unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 474 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (citation omitted). "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme …We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, at 732 (2022) (citation omitted); *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 160. The Final Rule attempts to answer a question of great political significance without clear congressional authorization and should be set aside on that basis alone. *See Louisiana*, 2024 WL 2978786, at *14-15 (finding "Congress did not give the Defendants 'clear statutory authorization' to enact the Final Rule" and concluded that Defendants lacked authority to decide this major question). This is especially true where the federal government "intrude[s] on education, which is an area 'where States historically have been sovereign.'" *Texas*, 2024 WL 2947022, at *37.

**B. The Final Rule's Harassment Standard is Contrary to Title IX.**

The Final Rule holds that "[s]ex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome,

subjectively and objectively offensive, and sufficiently severe *or* pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity." 89 Fed. Reg. at 33,516 (emphasis added). But the Supreme Court has already defined the bounds of harassment under Title IX—differently. Harassment exists when conduct "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" and when "the recipient exercises substantial control over both the harasser and the context." *Davis*, 526 U.S. at 633, 645. Further, the Court held that recipients violate Title IX only if they have "actual knowledge" of sexual harassment and are "deliberately indifferent" to it. *Id.* at 650. The Supreme Court made clear that it chose this stringent definition, in part, to avoid constitutional concerns. *Id.* at 649, 652-53. The Court's narrow definition accounted for "the practical realities of responding to student behavior." *Id.* at 653. Those "practical realities," the Court agreed, include the need to comply with the First Amendment. *See id.* at 649.

Significantly, *Davis* refused to adopt the definition of harassment that governs the workplace under Title VII; instead, it utilized the "severe *and* persuasive" language. Students are not employees, and Title IX's "severe *and* pervasive" standard reflects the greater First Amendment concerns that arise in the educational context. *See id.* at 651. The Final Rule's new broad "severe *or* pervasive" standard, which considers speech or other expressive conduct that "limits" a person's ability to participate in a program to be discriminatory harassment, thus cannot be squared with Title IX. 89 Fed. Reg. at 33,884. Nor can the Rule's requirement that a recipient consider conduct that occurred outside of

its program (or even outside of the United States) in determining whether a hostile environment has been created in its education program and activity. *Id.* at 33,530.

Further, the harassment standard in the Final Rule runs directly into the First Amendment concern *Davis* sought to avoid. The Eleventh Circuit has already held that a harassment definition similar to the Final Rule's harassment definition, when adopted by a public university, likely violates the First Amendment. There, a university defined "'Hostile Environment Harassment'" as "[d]iscriminatory harassment that is so severe *or* pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education ... or participation in a university program or activity ... when viewed from both a subjective and objective perspective." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114-15 (11th Cir. 2022) (emphasis added). The Eleventh Circuit held that this policy was "almost certainly unconstitutionally overbroad" and "an impermissible content- and viewpoint-based restriction of speech." *Id.* at 1125; *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 337, n.16 (5th Cir. 2020) (similar non-*Davis*-compliant harassment policy objectively chilled protected speech); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482, n.6 (S.D. Tex. 2022) ("Speech First will likely succeed on the merits because the original [harassment] policy does not comport with the standard adopted by the Supreme Court" in *Davis*.). As the court noted in *Louisiana*, "the 'harassment standard' created by the Final Rule is obviously contrary to Title IX, and Plaintiffs have made compelling arguments for how it can violate free speech rights of the First Amendment." 2024 WL 2978786, at *13. Since *Davis* already recognized the scope of prohibited harassment under Title IX, Defendants were not free to adopt an alternative requirement.

### III.   THE FINAL RULE IS ARBITRARY AND CAPRICIOUS.

Federal law prohibits agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A). A federal agency acts in an "arbitrary and capricious" manner when it: (1) "has relied on factors which Congress has not intended it to consider"; (2) "entirely fail[s] to consider an important aspect of the [regulatory] problem"; (3) "offer[s] an explanation for" its conduct "that runs counter to the evidence before" it; or (4) reaches a determination that "is so implausible … it could not be ascribed to a difference in view or … agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). At the outset, Defendants disregarded the "usual 90 day" window for comment once the proposed rule is published in the Federal Register. *See Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 453 (3d Cir. 2011). Here, the Department provided only thirty-two (32) days for comment. *See* 88 Fed. Reg. 22,860 (issuing notice of proposed rulemaking on April 13, 2023, and requiring comments to be received by May 15, 2023). In adopting the Final Rule over commenters' widespread opposition and decades of contrary practice, Defendants acted arbitrarily and capriciously. *See Louisiana*, 2024 WL 2978786, at *18 (finding that "despite receiving more than 240,000 comments, including numerous comments opposing the proposed rule, Defendants only made minor changes to the proposed rules").

Further, the Department failed to offer a "reasoned explanation" for the Final Rule's departure from the historic understanding of the meaning of Title IX's prohibition on "sex" discrimination, which has been codified in regulations since 1975. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *Texas*, 2024 WL 2947022 at *31 ("Title IX does *not*

*prohibit differential treatment* that allows for sex-separation or sex-specific benefits," rather it prohibits "differential treatment that … treats one biological sex worse than the other") (emphasis added). The Final Rule instead makes the reality-blinking statement that the Department "does not have a 'long-standing construction' of the term 'sex' in Title IX to mean 'biological sex.'" 87 Fed. Reg. at 41,537; *see Louisiana*, 2024 WL 2978786 at *19 (holding the Department failed to consider the fact that "[i]t is unambiguous that when Title IX was enacted, under the Supreme Court canons of construction, "sex discrimination" referred to biological females and males," and "did not refer to gender identity").

Citing *Bostock*, the Final Rule claims that the Department's interpretation is entirely consistent with reading "sex" to mean "biological sex." 89 Fed. Reg. at 33,802, 33,805. As discussed above, *Bostock*, though, does not apply. Such "[u]nexplained inconsistency in agency policy is a reason for holding [the Department's] interpretation to be an arbitrary and capricious change." *Encino Motorcars*, 579 U.S. at 222 (cleaned up). Indeed, the Department's internally conflicting analysis suggests that the Final Rule's justifications for redrawing Title IX reflect "contrived reasons" offered to support a predetermined result: Effectuating President Biden's day-one directive to find new federal authority for adopting "prohibitions on sex discrimination on the basis of gender identity." Exec. Order No. 13,988, 86 Fed. Reg. at 7,023 (capitalization altered); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019); *see also Tennessee*, No. 22-5807 (6th Cir. June. 14, 2024) (enjoining Biden Administration's attempt to implement same interpretations without going through notice-and-comment).

24

Relatedly, the Department failed to "engage in 'reasoned decisionmaking.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). This APA requirement means agencies cannot rest on "statements contradict[ing] earlier responses." *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015). The Department's stated reasoning offers "self-contradictory … logic" in spades. *Id.* at 16 (citation omitted); *see Louisiana.*, 2024 WL 2978786, at *16 (emphasizing "[a]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate"). For example, the Department points to Congress's allowing sex-separation in "living facilities" and 20 U.S.C. § 1681(1)-(9)'s exceptions as justification for omitting such facilities and programs from its gender-identity mandate. 89 Fed. Reg. at 33,816, 33,818-19. But the Department arbitrarily declines to extend the same treatment to bathrooms, toilets, and showers, which its regulations likewise permit to be separated based on sex. *Compare* 89 Fed. Reg. at 33,818-819, *with* 34 C.F.R. § 106.31(a)(2). Nor can the Department identify a rational basis to allow school activities and programs associated with Girls and Boys State to restrict participation based on biological sex, *see* § 1681(a)(7), yet at the same time require the participation of boys who identify as girls in sex-ed classes for girls, 34 C.F.R. § 106.31. Nor can it explain why its "longstanding athletics regulations" support continuing to allow some (unspecified) enforcement of sex-separate sports, 89 Fed. Reg. at 33,817, but the equally longstanding regulations governing bathrooms and locker rooms do not. Nor can the Department defend its assertion that consistently enforcing sex-separation policies based on persons' "physical differences" violates Title IX, since such differences underlie

Title IX's entire statutory and regulatory scheme. *Id.* at 33,819. Notably, there are too many

contradictions to demonstrate the requisite "reasoned decisionmaking."

The Department also failed to adequately "consider and respond to significant

comments received during the period for public comment" on the Final Rule. *Perez v.*

*Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see Louisiana*, 2024 WL 2978786, at *18

(holding the Rule is arbitrary and capricious per the APA because, among other reasons, it

"receiv[ed] more than 240,000 comments, including numerous comments opposing the

proposed rule…[but] only made minor changes[.]"). Commenters raised a multitude of

obviously valid concerns about the constitutional defects and compliance challenges

attending the Final Rule's approach. In response to many, the Final Rule offers only a

"handful of conclusory sentences" and "unexplained inconsistencies." *Gresham v. Azar*,

950 F.3d 93, 103 (D.C. Cir. 2020), *vacated as moot*, 142 S. Ct. 1665 (Mem.) (2022); *Dist.*

*Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). "Nodding to concerns

raised by commenters only to dismiss them in a conclusory manner is not the hallmark of

reasoned decisionmaking." *Gresham*, 950 F.3d at 103.

Moreover, the Department "entirely fail[ed] to consider [certain] important aspect[s]

of the problem" or address relevant evidence that "runs counter" to its cost-benefit

determination. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983); *see Louisiana*, 2024 WL 2978786, at *17–18 (holding "the DOE

failed to consider several relevant factors when drafting the Final Rule"). The Department

altogether ignored states' practical concerns about authenticating gender identity, for

instance, and it likewise sidestepped commenters' objections that the Final Rule endangers

privacy and safety interests. *See* 89 Fed. Reg. at 33,817. The Department rejected the view

that the Final Rule will "lessen[] the force of Title IX's protections against discrimination

that limits educational opportunities for girls and women," 89 Fed. Reg. at 33,808, ignoring

the evidence that men who identify as women have already taken such opportunities from

women. *See, e.g.*, Complaint, *Gaines et al. v. NCAA*, 1:24-cv-01109-MHC, 1, 4, 14-15

(N.D. Ga. 2024) (explaining that a transgender individual participated in 2021-2022 NCAA

women's swimming season and ranked first in events ranging "from the sprints to the

distance events").

The Department failed to consider evidence of the biological differences between

men and women that have long justified sex-separated facilities, certain sex-separated

classes, and sex-separated sports. *See Texas*, 2024 WL 2947022, at *34 (pointing out that

Supreme Court justices have long agreed that physical differences between males and

females are "real" and require separation "to afford members of each sex privacy from the

other sex"). And the Department downplayed the grave compliance challenges with

structuring school operations based on internal notions of gender identity that are

subjective and prone to fluidity and modification. For these reasons, the Final Rule was

"arbitrary [and] capricious" and an "abuse of [agency] discretion," and it should therefore

be declared unlawful, "set aside," and vacated. 5 U.S.C. § 706(2).

## IV. OKLAHOMA FACES IRREPARABLE HARM.

The Department of Education's Final Rule inflicts significant, irreparable harm on

Oklahoma that only prompt judicial intervention can redress. *First*, Oklahoma is unable to

enforce its own laws without coming into conflict with the Final Rule. For example,

Oklahoma's educational institutions that offer male and female sports would be forced to choose between complying with Oklahoma's statutes and existing rules or complying with the Final Rule's prohibition on gender-identity discrimination.

The Final Rule purports to preempt Oklahoma laws governing athletics, and thus, causes irreparable harm to the State of Oklahoma's sovereign lawmaking authority. Set out in Oklahoma's Save Women's Sports Act, female athletic teams "shall not be open to students of the male sex." Okla. Stat. tit. 70, § 27-106(E)(1). And, of course, there is the law regulating school restrooms that this Court has already upheld against a Title IX attack in *Bridge*.

Similarly, the Final Rule's prohibition of harassment based on gender identity conflicts with Oklahoma's protections of student and faculty speech. *See* Okla. Stat. tit. 70, § 24-157; Okla. Admin. Code. § 210:10-1-23. Even before finalizing the Final Rule, the Department, like the preceding Obama Administration, used Title IX investigations to promulgate its view of "faculty misgendering" as evidence of a "hostile environment based on sex" in violation of Title IX. And beyond such enforcement actions, educational institutions face the threat of private suits for violations of Title IX. *See Davis*, 526 U.S. at 642–43, 650.

Oklahoma further suffers the "irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment); *Cloud Peak Energy Inc. v. United States Dep't of Interior*, 415 F. Supp. 3d 1034, 1042 (D. Wyo. 2019) (recognizing that the Tenth Circuit has held that unrecoverable economic costs can constitute irreparable harm "for

preliminary injunction purposes."). Enforcement of the Final Rule also threatens to collectively strip Oklahoma of millions in federal Title IX funds and to impose substantial penalties through private suits. This severe financial exposure in turn endangers important programs that serve attendees of Oklahoma's schools and higher-education institutions.

Oklahoma is home to forty-nine (49) public colleges and universities benefiting higher education. *See generally* Okla. Stat. tit. 70, § 3101 *et. seq.* All post-secondary education programs received approximately $350 million in federal funds in Fiscal Year 2022-23,[14] subjecting them to Title IX. These postsecondary institutions use federal funds for many purposes, including student loans, student grant aid, research and service, and veterans' affairs. Losing Title IX funds will require those institutions to eliminate certain educational services or seek new funding. Additionally, students who rely on federal funds to attend those institutions might have their education interrupted, resulting in disenrollment or abandonment of a degree or other program.

In essence, Oklahoma faces the stark reality that the Department will enforce the Final Rule against them and terminate federal assistance to noncomplying state entities, inflicting imminent harm on Oklahoma. *See* 20 U.S.C. § 1682.

## V.   THE THREATENED HARM TO OKLAHOMA EXCEEDS ANY INJURY DEFENDANTS COULD FACE, AND THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST.

The third and fourth elements for a preliminary injunction counsel in favor of issuing an injunction in Oklahoma's favor. Defendants face virtually no cognizable harm,

---

[14] *See* U.S. Dept. of Educ., *Fiscal Years 2023-2025 State Tables for the U.S. Department of Education*, https://perma.cc/753G-GG3H (last visited May 5, 2024).

since an injunction merely preserves the status quo. *Texas v. United States*, 787 F.3d 733, 768 (5th Cir. 2015); *see also Tennessee*, No. 22-5807 (6th Cir. June. 14, 2024) (approving injunction against the federal government's attempts to enforce similar interpretations found in guidance documents). The very real injuries Oklahoma may face (as outlined above) far outweigh any harm to Defendants. Likewise, an injunction is in the public interest. The public has no "interest in enforcing" a rule that is unlawful. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). "There is generally no public interest in the perpetuation of unlawful agency action. . . . [t]o the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted). Likewise, "the public interest is served when constitutional rights are protected" from government overreach. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). And "[e]nforcing the Spending Clause's limitations helps preserve state sovereignty and the 'two-government system established by the Framers.'" *Morrisey*, 59 F.4th at 1149. The public interest will be advanced by issuing preliminary relief in this matter.

## VI.   OKLAHOMA REQUESTS AN EXPEDITED RULING.

Given the Final Rule's effective date of August 1, 2024, Oklahoma respectfully requests an expedited ruling on this Motion for Preliminary Injunction and respectfully requests that the Court set a briefing schedule and oral argument (if desired) with sufficient time to allow the Court to rule on the Motion prior to the August 1 effective date.

Respectfully submitted,

*s/ Barry G. Reynolds*
Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax:    (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

*ATTORNEYS FOR THE STATE OF OKLAHOMA*

## CERTIFICATE OF SERVICE

This is to certify that on this 28th day of June 2024, the foregoing instrument was electronically filed with the Clerk of the Court by using the CM/ECF system. Since counsel for the Defendants have yet to enter an appearance in this matter, Plaintiff's Counsel will serve a copy of this motion on the Defendants in accordance with F.R.C.P. 4(i) at the following addresses:

Miguel Cardona, Secretary of Education
United States Department of Education
400 Maryland Ave. SW
Washington, D.C. 20202

Miguel Cardona, Secretary of Education
c/o Robert J. Troester, US Attorney for
  Western District of Oklahoma
210 Park Ave., Ste. 400
Oklahoma City, OK  73102

Miguel Cardona, Secretary of Education
c/o Merrick Garland,
  US Attorney General
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC  20530

United States Department of Education
400 Maryland Ave. SW
Washington, D.C. 20202

United States Department of Education
c/o Robert J. Troester, US Attorney for
  Western District of Oklahoma
210 Park Ave., Ste. 400
Oklahoma City, OK  73102

United States Department of Education
c/o Merrick Garland,
  US Attorney General
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC  20530

 /s/ *Barry G. Reynolds*
Barry G. Reynolds