**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

STATE OF OKLAHOMA,

      *Plaintiff*,

v.

MIGUEL CARDONA, in his official capacity
as the Secretary of Education for the United
States Department of Education; and UNITED
STATES DEPARTMENT OF EDUCATION,

      *Defendants*.

Case No. 5:24-cv-00461-JD

District Judge Jodi W. Dishman

---

**MOTION FOR LEAVE TO FILE A BRIEF AS AMICI CURIAE IN SUPPORT
OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

---

The undersigned, Giancarlo G. Piccinini, on behalf of Proposed Amici States New
Jersey, California, Pennsylvania, Colorado, Delaware, District of Columbia, Hawai'i,
Illinois, Massachusetts, Michigan, Minnesota, New York, Oregon, Rhode Island, Vermont,
and Washington ("Amici States"), hereby respectfully moves for leave to file a brief as *amici
curiae* in support of Defendants' opposition to Plaintiff's motion for preliminary injunction.
A copy of the proposed amicus brief is attached hereto as "Exhibit 1."

1

District courts have broad discretion to permit appearances as *amicus curiae*. *See Pickup v. Dist. Ct. of Nowata Cty., Okla.*, 2023 WL 1394896, at *51 (N.D. Okla. Jan. 31, 2023). Leave to file an amicus brief should generally be granted "when the amicus has an interest in some other case that may be affected by the decision in the present case . . . or when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Id.* at *52 (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997)); *see also N.M. Oncology & Hematology Consultants Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1175-76 (10th Cir. 2021) (motions for leave to participate as amicus under Fed. R. App. P. 29 may be granted where the brief provides the court with useful information, and the briefing is relevant to the disposition of the case); *Lieberenz v. Wilson*, 2024 WL 2952150, at *5 n.6 (10th Cir. 2024) (same); *Albuquerque Pub. Sch. Bd. of Ed. v. Armstrong*, 2022 WL 17576355, at *3 n.2 (10th Cir. 2022) (same).

Federal appellate courts expressly recognize the value that inheres in sovereign states' contributions to resolving legal issues through amicus briefing, allowing states to file as of right. *See* Fed. R. App. P. 29(a)(2) ("[A] state may file an amicus brief without the consent of the parties or leave of court."). Although this Court does not have a similar rule, *Pickup*, 2023 WL 1394896, at *51, and given the procedural posture of this case, Amici States respectfully request that the Court grant leave to file the attached proposed amicus brief under general principles of amicus briefing for the following reasons:

1.    Amici States, all of which accept federal funding subject to Title IX,[1] are home to millions of students attending tens of thousands of public elementary and secondary schools. As of fall 2022, Amici States were collectively responsible for the education of 19,782,273 students[2] attending 40,236 public primary and secondary schools,[3] representing 39.9% of all students at public primary and secondary schools, and 40.5% of the schools they attend, nationwide.

2.    Additionally, 5,335,496 students attended Amici States' public degree-granting postsecondary institutions as of fall 2022.[4]

3.    Amici States also have numerous private and charter schools, vocational and technical training programs, and private postsecondary institutions which may accept federal educational funding.

4.    Plaintiff in this case seeks to enjoin enforcement of the U.S. Department of Education's ("ED") new rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule") nationwide, which would impact Amici States' compelling interests in

---

[1] Nat'l Ctr. for Educ. Stats., Digest of Education Statistics tbl. 235.20 (2023), https://nces.ed.gov/programs/digest/d23/tables/dt23_235.20.asp.
[2] *See id.* tbl. 203.40 (2023), https://nces.ed.gov/programs/digest/d23/tables/dt23_203.40.asp.
[3] *See id.* tbl. 216.70 (2023), https://nces.ed.gov/programs/digest/d23/tables/dt23_216.70.asp.
[4] *See id.* tbl. 304.15 (2023), https://nces.ed.gov/programs/digest/d23/tables/dt23_304.15.asp.

ensuring that their educational programs operate free of sex discrimination and sexual harassment and protecting all students from harm.

5.      Amici States offer an important and unique perspective in this case as sovereign states charged with ensuring that our schools operate in a manner that is free from sex discrimination and harassment, including on the basis of gender identity and sexual orientation. Amici States' experience confirms that sex discrimination and harassment based on gender identity and sexual orientation, and sex stereotypes imposed on LGBTQ individuals, causes direct economic, physical, and emotional harms to students. To prevent these tangible injuries, Amici States have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different from their sex assigned at birth, or that they are attracted to someone of the same sex, and to ensure that students in our jurisdictions have the ability to learn in safe and supportive environments. The Final Rule furthers these efforts by clarifying protections for LGBTQ students and rectifying the harm caused to our schools and communities through ED's prior rule, promulgated in 2020, which undermined Title IX's nondiscrimination mandate by arbitrarily narrowing the scope of Title IX's sexual harassment protections.

6.      The proposed amicus brief is relevant to the disposition of the case and will assist the Court by providing unique and useful information in understanding the impact of enjoining the Final Rule on the public interest and students nationwide. Importantly, Amici States' experiences discussed in the proposed amicus brief demonstrate that preventing sex-based discrimination, protecting against sexual harassment, and ensuring equal access to educational opportunities for all students, without regard to sex, sex stereotypes, or sex

characteristics, confer wide educational and societal benefits without imposing substantial costs on our schools or compromising our students' privacy or safety.

7.      Among other relevant and important information, the proposed amicus brief highlights Amici States' experiences with implementing bathroom and locker room facility policies that allow students to use bathrooms consistent with their gender identity, and the ways implementation of such policies can safeguard against serious harm for transgender students, while also protecting student privacy and safety, underscoring that the Final Rule will further the goal of creating safe and supportive school environments for all students.

8.      The proposed brief also highlights Amici States' experiences with protecting students from both severe *and* pervasive sexual harassment on school campuses and how such protection is important to foster safe and supportive school environments that allow students to grow and thrive academically and individually. On the other hand, the proposed amicus brief addresses how a return to ED's prior regulatory efforts to narrow Title IX protections would impose significant costs on local and state governments nationwide when students experience increased or uncorrected incidents of sex-based discrimination and sexual harassment, including financial, health, and societal costs, increased student absenteeism, lost revenue from dropouts, and increased unemployment and health and emergency services costs.

9.      Overall, the proposed amicus brief demonstrates that Plaintiff's narrow interpretation of Title IX and the Final Rule runs contrary to Amici States' experiences, is not supported by law or ED's prior longstanding policy and practice, and that the balance of equities and public interest cut strongly against the extraordinary relief Plaintiff seeks.

10.     Amici States thus respectfully request that this Court grant this motion for leave to file the proposed amicus brief and deem the attached *amici curiae* brief filed.

Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Giancarlo G. Piccinini*

GIANCARLO G. PICCININI
(Appearing *pro hac vice*)
JESSICA L. PALMER
ANDREW H. YANG
AMANDA I. MOREJÓN
LAUREN E. VAN DRIESEN
Deputy Attorneys General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07101
(973) 648-3574
Giancarlo.Piccinini@law.njoag.gov
*Attorneys for Proposed Amicus Curiae*
*State of New Jersey*

**MICHELLE HENRY**
*Attorney General*
*Commonwealth of Pennsylvania*

*/s/ Lisa E. Eisenberg*

LISA E. EISENBERG
Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 560-2980
leisenberg@attorneygeneral.gov

*Attorney for Proposed Amicus Curiae*
*Commonwealth of Pennsylvania*

**ROB BONTA**
*Attorney General*
*State of California*

*/s/ Laura Faer*

LAURA FAER
Supervising Deputy Attorney General
CHRISTINA RIEHL
DELBERT TRAN
EDWARD NUGENT
Deputy Attorneys General
California Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 94612-0552
(510) 879-3305
Laura.Faer@doj.ca.gov

*Attorneys for Proposed Amicus Curiae State of*
*California*

*[additional counsel listed on subsequent page]*

## ADDITIONAL COUNSEL

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W.
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i, 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, July 17, 2024, I caused the attached documents to be filed with the Clerk of the Court via CM/ECF, which will send notification of such filing to all counsel of record.

Dated: July 17, 2024                    Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

<u>/s/ *Giancarlo G. Piccinini*</u>
Giancarlo G. Piccinini
Bar Number: 414322022
Attorney for Amici States
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
P.O. Box 45029-5029
Newark, NJ 07101
(973) 648-2893

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| STATE OF OKLAHOMA, | |
| *Plaintiff*, | |
| v. | Case No. 5:24-cv-00461-JD |
| MIGUEL CARDONA, in his official capacity as the Secretary of Education for the United States Department of Education; and UNITED STATES DEPARTMENT OF EDUCATION, | District Judge Jodi W. Dishman |
| *Defendants*. | |

**BRIEF OF AMICI CURIAE NEW JERSEY, CALIFORNIA, PENNSYLVANIA, COLORADO, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Pages**

INTRODUCTION AND INTERESTS OF AMICI CURIAE................................1

ARGUMENT ......................................................................................................2

    I.      AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BROAD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS. ................................................. 2

        A.    The Final Rule's Benefits Will Not Compromise Student Privacy or Safety. ....................................................... 2

        B.    The Final Rule Will Foster Positive Health Outcomes For LGBTQ Students.................................................... 6

    II.    THE FINAL RULE DEFINES "SEX-BASED HARASSMENT" IN A WAY THAT EFFECTUATES TITLE IX WITHOUT BURDENING OR SURPRISING THE STATES. .......................... 8

    III.    THE FINAL RULE DOES NOT VIOLATE THE SPENDING CLAUSE. .................................................................... 12

CONCLUSION .................................................................................................13

i

# TABLE OF AUTHORITIES

**Pages**

**CASES**

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) .......................................................................................... 13

*Brown v. Bd. of Educ.,*
  347 U.S. 483 (1954) ........................................................................................ 4, 6

*Davis v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ........................................................................................... 9

*Fennell v. Marion Indep. Sch. Dist.,*
  804 F.3d 398 (5th Cir. 2015) ............................................................................. 9

*Franklin v. Gwinnett Cnty. Public Schs.,*
  503 U.S. 60 (1992) ............................................................................................ 11

*Gebser v. Lago Vista Indep. Sch. Dist.,*
  524 U.S. 274 (1998) ........................................................................................... 9

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ........................................................................... 13

*J.A.W. v. Evansville Vanderburgh Sch. Corp.,*
  396 F. Supp. 3d 833 (S.D. In. 2019) ............................................................... 13

*Mahanoy Area Sch. Dist. v. B.L.,*
  594 U.S. 180 (2021) ............................................................................................ 1

*Meritor Sav. Bank, FSB v. Vinson,*
  477 U.S. 57 (1986) ............................................................................................ 11

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ........................................................................................... 6

*Tennessee v. U.S. Dep't of Agric.,*
  665 F. Supp. 3d 880 (E.D. Tenn. 2023) .......................................................... 13

*Tovar v. Essentia Health,*
  342 F. Supp. 3d 947 (D. Minn. Sept. 20, 2018) .............................................. 13

**FEDERAL STATUTES**

20 U.S.C. § 1682 ..................................................................................................... 9

20 U.S.C. § 1686 ..................................................................................................... 6

Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 ............. 1, 9

# FEDERAL REGULATORY MATERIALS

U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001)... 10

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020). 11

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) 1, 9

Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023), https://tinyurl.com/yv397h94. ...................................... 4

Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448 (Mar. 10, 1994); ......................... 10

Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017)................................................. 10

Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997)................. 10, 12

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) ......................................................................................................... 10

U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017)..................................................................................... 10

# STATE STATUTES AND REGULATORY MATERIALS

Affirming & Inclusive Schs. Task Force, Strengthening Inclusion in Illinois Schools (2020). .................................................................................................... 5

Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013) ..................................................... 2

Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities (2014). .... 5

Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students (n.d.)................................... 5

Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws (2012). ................... 5

D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance (2015). .................................................................................................................. 6

Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act (2021) ........................................................................ 5

Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students (2020)..................................... 5

Iowa Code § 216.2(10) ...........................................................................12

Iowa Code § 216.7 ..................................................................................12

Iowa Code § 216.8 ..................................................................................12

Iowa Code § 216.9 ..................................................................................12

Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021).......5

Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination (2015). ...................................................................................................5

Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students (2016). ..................................5

Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students (2017)..................................5

N.H. Rev. Stat. Ann. § 354-A:16 ............................................................12

N.H. Rev. Stat. Ann. § 354-A:2(XIV-e) ..................................................12

N.H. Rev. Stat. Ann. § 354-A:27 ............................................................12

N.H. Rev. Stat. Ann. § 354-A:6 ..............................................................12

N.J. State Dep't of Educ., Transgender Student Guidance for School Districts (2018)....................................................................................................5

N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices (June 2023). ..............................................5

Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance for Schools (2023). .......................................................................................6

R.I. Dep't of Educ., Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students (2016).....................................................6

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* (Wash. Off. of Superintendent of Pub. Instruction 2012), https://tinyurl.com/yk26eb96..................................................................5

Vt. Agency of Educ., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students (2017)..................................6

**OTHER AUTHORITIES**

Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016), https://tinyurl.com/224mzep4.............4

Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016), https://tinyurl.com/mtpescst ..................................................... 2

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1 (Mar. 31, 2021), https://tinyurl.com/2s2ucz9t . ..................................................................... 4

Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017) (No. 16-273), 2017 WL 930055 ................................................... 4

Ctrs. For Disease Control, Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021 (2023), https://tinyurl.com/2p6w6yrv. .................... 11

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009). ........................................... 8

*Feminist Majority Found. v. Hurley,* 911 F.3d 674 (4th Cir. 2018) ........................ 9

Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023). .................... 7

Interim Other Sexual Misconduct Policy, Harvard Univ. (Aug. 26, 2022), https://tinyurl.com/muzzhxhs. ........................................................................ 11

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020) .............................................. 11

Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2016), https://tinyurl.com/5av274d3 ................................. 3, 8

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), https://tinyurl.com/2aabcfe4 ........................................................................... 3, 7

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223 (Mar. 2016); ........... 4, 8

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97-98 (Feb. 17, 2019), https://tinyurl.com/5f97nkbx. ......................................................... 3, 6, 11

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67 (2019), https://tinyurl.com/bdf64cbs. ..... 7

Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (current as of Jan. 1, 2023) .................................. 12

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* (Apr. 2017) ............................ 12

v

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016). ........................................................... 7, 8

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN (2017), https://tinyurl.com/ukvkv8tf. .............. 7

Sexual and Gender-Based Harassment Policy, Harvard Univ. (Feb. 10, 2017), https://tinyurl.com/m272ckyy. ............................................................... 11

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 5 (2023), https://tinyurl.com/mvbmabrw ................................. 3, 7

Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022), https://tinyurl.com/ms6eubb7. .......................................................... 13

University of Southern Mississippi, *Sexual Misconduct*, https://tinyurl.com/bdzszfx3 (last visited July 16, 2024). .................................. 11

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

Amici States have compelling governmental interests in the robust enforcement of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, to ensure that our schools operate in a manner that is free from sex discrimination. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189-90 (2021). As sovereign jurisdictions charged with enforcing state antidiscrimination laws and shaping school policies that foster a safe and supportive environment for all students, Amici States take the implementation of Title IX regulations seriously. Sex discrimination and harassment based on sexual orientation or gender identity, and sex stereotypes imposed on LGBTQ individuals, cause direct economic, physical, and emotional harms to students. To prevent these tangible injuries, Amici States have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different from their sex assigned at birth, or that they are attracted to someone of the same sex. The U.S. Department of Education's ("ED") final rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule"), advances Amici States' ability to protect students from discrimination and harassment.

Amici States' experience demonstrates that preventing sex-based discrimination, protecting against sexual harassment, and ensuring equal access to educational opportunities confer wide societal benefits without imposing substantial costs on schools or compromising student privacy or safety. The same is true under the Final Rule, which includes explicit protections for LGBTQ students and rectifies the harm caused to our

1

schools and communities through ED's prior rule ("2020 Rule"). The 2020 Rule undermined Title IX's nondiscrimination mandate by arbitrarily narrowing the scope of Title IX's sexual harassment protections.

Amici States submit this brief to present their experience that gender-inclusive policies in education have direct and significant educational, social, mental, physical, and emotional benefits to our residents, our communities, and our states and society as a whole, and that the balance of equities and public interest cut against the extraordinary relief Plaintiff seeks. Amici States urge the Court to deny Plaintiff's motion so that the Final Rule may benefit students across the Nation.

## ARGUMENT

**I.   AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BROAD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS.**

### A.   The Final Rule's Benefits Will Not Compromise Student Privacy or Safety.

Amici States' experience demonstrates that allowing students to use bathrooms and locker rooms consistent with their gender identity significantly benefits those students without risking student privacy or safety. Allowing transgender students to use bathrooms consistent with their gender identity safeguards against significant health impacts, such as forgoing drinking or eating during the school day to avoid using the restroom for fear of exclusion, reprimand, or bullying.[1]

---

[1] *See* Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013); Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016), https://tinyurl.com/mtpescst. *See also* The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young*

2

When subjected to discrimination and harassment, including through restroom exclusion, LGBTQ students suffer significant educational harm.[2] For example, one 2021 survey showed that LGBTQ students who experienced discrimination in their schools were almost three times as likely (43.3% versus 16.4%) to have missed school because they felt unsafe or uncomfortable.[3] LGBTQ students subjected to discriminatory policies and practices also had lower grade point averages and educational achievement, lower levels of educational aspiration, lower self-esteem, and higher levels of depression than other students who had not encountered such discrimination.[4]

While discriminatory environments that cause fear and anxiety weaken a child's cognitive capacity and disrupt effective learning, safe and supportive school environments allow students to develop positive relationships, regulate their emotions and behavior, and maintain their physical, psychological, and academic well-being.[5] When allowed to use bathroom and locker room facilities consistent with their gender identity, transgender

---

*People* 5 (2023), https://tinyurl.com/mvbmabrw [hereinafter Trevor Project 2023] (noting that approximately half of transgender and nonbinary youth reported in 2023 having seriously considered suicide in the past twelve months).

[2] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xix, 36 (2022), https://tinyurl.com/2aabcfe4 [hereinafter Kosciw 2021].

[3] *Id.* at 36.

[4] *Id.* at 35-36, 42-45; Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016), https://tinyurl.com/5av274d3 [hereinafter Kosciw 2015].

[5] *See* Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97-98, 102 (Feb. 17, 2019), https://tinyurl.com/5f97nkbx.

students experience better mental health outcomes that are more comparable to their cisgender peers.[6] These positive outcomes, in turn, benefit states as a whole, since equal education better prepares students to contribute to society, both culturally and economically. *Cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

Amici States' experience also demonstrates that allowing transgender students to access facilities corresponding to their gender identity does not result in increased privacy or safety concerns, nor does it result in specific instances of transgender students harassing others when using restrooms or locker rooms consistent with their gender identity.[7] The documented experience of school administrators in thirty-one states and the District of Columbia demonstrates that sex-based protections for gender identity in bathroom- and locker room-use policies result in no public safety or privacy risks, nor is there evidence that cisgender students pose as transgender to gain improper restroom access.[8]

The Final Rule affords ample flexibility for schools to implement policies to address privacy concerns, and Amici States have already increased privacy options for all students

---

[6] *See* Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016); Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't [hereinafter Br. of Amici Curiae Sch. Adm'rs] at 4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017) (No. 16-273), 2017 WL 930055.

[7] *See* Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016), https://tinyurl.com/224mzep4; Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://tinyurl.com/2s2ucz9t .

[8] *See* Br. of Amici Curiae Sch. Adm'rs at 14-16; Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (May 30, 2023), https://tinyurl.com/yv397h94.

in a cost-effective manner. For example, in Washington, where districts must allow students to use the restroom or locker room consistent with their gender identity, schools must provide any student "who has a need or desire for increased privacy, regardless of the underlying reason," with access to an alternative restroom, alternative changing area, or separate changing schedule.[9] At least thirteen other states and the District of Columbia offer comparable guidance to ensure that school districts can comply with nondiscrimination policies and address privacy concerns.[10] Solutions range from offering

---

[9] *See* Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://tinyurl.com/yk26eb96.

[10] **California**: Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities 2 (2014). **Colorado**: Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students 4-5 (n.d.). **Connecticut**: Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws 9-10 (2012). **Illinois**: Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act 6-7 (2021); Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students 10-11 (2020); Affirming & Inclusive Schs. Task Force, Strengthening Inclusion in Illinois Schools 19-21 (2020). **Maryland**: Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination 13-14 (2015). **Massachusetts**: Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021). **Michigan**: Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students 5-6 (2016). **Minnesota**: Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students 10 (2017). **New Jersey**: N.J. State Dep't of Educ., Transgender Student Guidance for School Districts 7 (2018). **New York**: N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (June 2023). **Oregon**: Or. Dep't of Educ., Supporting Gender Expansive Students:

privacy curtains to separate restroom and changing rooms to all who desire them, none of which requires costly construction or remodeling.

Maintaining sex-separated spaces while allowing transgender students to use restrooms and locker rooms that align with their gender identity not only results in positive educational and health outcomes for students, but also promotes Amici States' compelling interest in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984). Ensuring equal access to facilities that align with gender identity is therefore not only consistent with Title IX's provision for sex-separated facilities, 20 U.S.C. § 1686, but also with the constitutional guarantee that education be "made available to *all* on *equal* terms," *Brown*, 347 U.S. at 493 (emphasis added).

## B.   The Final Rule Will Foster Positive Health Outcomes For LGBTQ Students.

Amici States' experience also reflects that LGBTQ students suffer concrete harms when they are denied Title IX's protection against discrimination and harassment. Neuroscientific research and developmental studies indicate that a child's social, emotional, and academic development is closely related to their educational environment,[11]

---

Guidance for Schools 24-26 (2023). **Rhode Island**: R.I. Dep't of Educ., Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students 8-9 (2016). **Vermont**: Vt. Agency of Educ., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students 6, 8 (2017). **District of Columbia**: D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance 9 (2015).

[11] Darling-Hammond et al., *supra* note 5, at 97-98.

and negative effects of discrimination and harassment can impede cognitive development, disrupt the learning process, and endanger psychological well-being.

In a recent study, almost 90% of LGBTQ students reported hearing homophobic slurs from peers, while more than 68% reported feeling unsafe in schools due to their gender identity, gender expression, or sexual orientation.[12] In a 2022 survey of LGBTQ teenagers, 56.9% of LGBTQ youth reported being verbally or physically harassed at least once in the past thirty days.[13] Of students known or perceived to be transgender, 77% reported negative experiences at school, including harassment and physical assault.[14] And as many as 75% of transgender students surveyed in 2017 felt unsafe at school as a result of their gender identity or gender expression.[15] As a group, transgender students are up to five times more likely to report being bullied at school, threatened or injured with a weapon at school, and being sexually assaulted.[16] Another 2022 survey found that 64% of transgender and nonbinary youth reported discrimination because of their gender identity.[17] In the largest survey of transgender people to date, 17% of respondents reported that they left K-

---

[12] Kosciw 2021, *supra* note 2, at xv-xvi, 83, 93.

[13] Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023).

[14] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016).

[15] *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 4 (2017), https://tinyurl.com/ukvkv8tf.

[16] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019), https://tinyurl.com/bdf64cbs.

[17] Trevor Project 2023, *supra* note 1, at 16.

12 school because of the mistreatment they suffered as a result of their gender expression.[18] And a 2009 study found that 40% of students who experienced frequent verbal harassment because of their gender expression did not plan to continue on to college.[19]

By contrast, LGBTQ students who are supported by school staff are less likely to feel unsafe, miss school, or say they may not graduate high school because of their sexual orientation or gender expression, and are more likely to have higher GPAs and feel a greater sense of belonging to their school community.[20] When transgender youth do not suffer severe discrimination and instead have their gender identity affirmed, their mental health outcomes mirror those of their cisgender peers: they experience reduced suicidal ideation, fewer suicide attempts, and enhanced well-being and functioning.[21]

## II.   THE FINAL RULE DEFINES "SEX-BASED HARASSMENT" IN A WAY THAT EFFECTUATES TITLE IX WITHOUT BURDENING OR SURPRISING THE STATES.

The Final Rule's definition of sex-based harassment as conduct that "is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the

---

[18] James et al., *supra* note 14, at 135.

[19] Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 25-27 (2009).

[20] Kosciw 2015, *supra* note 4, at xx-xxi.

[21] Olson, *supra* note 6, at 5-7; *see also* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022), https://tinyurl.com/y86j5jnp; Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018), https://tinyurl.com/465z8reh; *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces*, The Trevor Project (Dec. 2020), https://tinyurl.com/2c2p7zkf.

8

recipient's education program or activity," 89 Fed. Reg. at 33,884, comports with the text and intent of Title IX and enables states and stakeholders to prohibit harassment and redress hostile environments. In Amici States' experience, sex-based harassment need not be severe *and* pervasive to create tangible injury to a student's education. For example, a teacher's repeated inappropriate sexual comments and intrusions of personal space may not be "severe," but could be so pervasive that a student feels unsafe and avoids classes, and is effectively excluded from education. *See, e.g.*, *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 680-82, 687-89, 693 (4th Cir. 2018) (finding a series of harassing social media posts sent over campus wireless network could support Title IX harassment claim); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (noting that "offensive remarks made every few months over three years" raised genuine dispute regarding Title VII hostile environment).

By covering severe *or* pervasive forms of harassment, the Final Rule also effectuates the breadth of 20 U.S.C. § 1681(a) and advances Congress' objectives, because "the scope of the behavior that Title IX proscribes" is not limited to "severe, pervasive, and objectively offensive" conduct. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639, 652 (1999). Congress established an administrative scheme authorizing ED "to give effect to" the goals of Title IX. *Davis*, 526 U.S. at 638-39; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998); 20 U.S.C. § 1682.[22] Consistent with Title IX's

---

[22] Plaintiff mistakenly relies on *Davis* to argue that harassment must be "severe *and* pervasive." Pls.' Br. Supp. Prelim. Inj. 21, ECF No. 21. But *Davis* applies only to private damages claims, 526 U.S. at 652; *see also Gebser*, 524 U.S. at 283-84, 287, and does not otherwise limit ED's regulatory authority, *see Gebser*, 524 U.S. at 292.

Congressional design, the Final Rule protects students from both severe incidents of harassment, as well as any series of lesser, unwelcome incidents that become pervasive.

Amici States' experience also reflects that no sovereign jurisdiction should be burdened or surprised by the Final Rule's return to the "severe or pervasive" standard. For more than thirty years, ED defined harassment as conduct that was "sufficiently severe, pervasive or persistent" to *interfere with, limit, or adversely affect*, rather than *deny*, a student's ability to participate in or benefit from an education program or activity, and consistently applied this definition to address harassment under Title IX and Title VI.[23] Amici States have long understood that this definition applies to their schools, and the Final Rule correctly returns to ED's longstanding definition that provides appropriate baseline protections against sexual harassment in our schools.[24] *See, e.g.*, *Meritor Sav. Bank, FSB*

---

[23] *See, e.g.*, Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994); Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,038 (Mar. 13, 1997) [hereinafter 1997 Guidance] ("[S]exual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education . . . ."); U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001), at v, 6 (noting that harassment must "deny or limit" student's education, and single "sufficiently severe" incident of sexual harassment can create hostile environment); Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) ("The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment . . . ."); U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) (same); U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) (applying "severe, persistent, or pervasive" and "deny or limit" standards).

[24] For example, Harvard University's 2017-2020 sexual harassment policy defined a hostile environment as one that "can be created by persistent or pervasive conduct or by a single severe episode. The more severe the conduct, the less need there is to show a repetitive

*v. Vinson*, 477 U.S. 57, 67 (1986) (protecting employees, including student employees, from sexual harassment that is "severe or pervasive"); *Franklin v. Gwinnett Cnty. Public Schs.*, 503 U.S. 60, 75 (1992).

Finally, in Amici States' experience, a definition of sexual harassment that encompasses both severe harassment and pervasive forms of harassment is essential to ensure the safety and sense of belonging that students need in order to learn and thrive. Students who experience safe and supportive school climates see improvements in academic achievement and healthy development, and such schools are more effective at preventing violence and retaining teachers.[25] (*See also supra*, at pp. 3-9.) On the other hand, ED itself estimated that the 2020 Rule's narrow interpretation of Title IX's protections would reduce investigations of sexual harassment by 50% in K-12 schools,[26] exacerbating the effects of severe underreporting confirmed by research showing that

___

series of incidents to prove a hostile environment." Sexual and Gender-Based Harassment Policy, Harvard Univ. 2-3 (Feb. 10, 2017), https://tinyurl.com/m272ckyy. Even after the 2020 Rule, Harvard continued to use a "persistent or pervasive" standard to protect students. Interim Other Sexual Misconduct Policy, Harvard Univ. 1-2 (Aug. 26, 2022), https://tinyurl.com/muzzhxhs. Similarly, the University of Southern Mississippi's current sexual misconduct policy includes examples of conduct that is pervasive but not necessarily severe, such as repeated inappropriate sexual comments. *See* University of Southern Mississippi, *Sexual Misconduct*, https://tinyurl.com/bdzszfx3 (last visited July 16, 2024).

[25] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020); Darling-Hammond et al., *supra* note 5, at 97-98; *see also* Ctrs. For Disease Control, Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021 72 (2023), https://tinyurl.com/2p6w6yrv.

[26] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,551-52, 30,565-68 (May 19, 2020).

sexual harassment and assault occur at alarming rates. For example, more than 20% of girls between the ages of fourteen and eighteen have been kissed or touched without their consent, but no more than 3% reported the incidents to police or school administrators.[27] The Final Rule's definition of sexual harassment reasonably protects students from severe or pervasive harassment and its devastating impacts on students' physical, emotional, and academic well-being.[28]

## III.   THE FINAL RULE DOES NOT VIOLATE THE SPENDING CLAUSE.

Contrary to Plaintiff's assertion, the Final Rule does not violate the Spending Clause's clear-statement rule. The Final Rule does not require any state to establish new programs; it merely clarifies that established programs must protect LGBTQ students from discrimination on the basis of sex, using the Title IX framework that funding recipients already have in place. Many Amici States and other states and cities have already implemented these and similar protections,[29] and have incurred *de minimis* costs in doing

---

[27] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017).

[28] 1997 Guidance, 62 Fed. Reg. at 12,034 ("[S]exual harassment can interfere with a student's academic performance and emotional and physical well-being, and . . . preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.").

[29] At least twenty-three states and the District of Columbia, and at least 374 municipalities, already provide express protection against discrimination for LGBTQ people in a variety of areas. *See, e.g.*, Iowa Code § 216.2(10) (definition); *id.* § 216.7 (public accommodations); *id.* § 216.8 (housing); *id.* § 216.9 (education); N.H. Rev. Stat. Ann. § 354-A:2(XIV-e) (definition); *id.* § 354-A:6 (employment); *id.* § 354-A:16 (public accommodations); *id.* § 354-A:27 (education); Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (current as of Jan. 1, 2023).

so, while conferring significant benefits to students.[30] Moreover, many courts have held that discrimination based on LGBTQ identity is sufficiently ascertainable from Title IX's prohibition against sex discrimination, such that the clear-statement rule is satisfied. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 n.18 (4th Cir. 2020); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. In. 2019).[31] And every state in the Union is already required to prohibit discrimination against LGBTQ people for all employees, including student employees, in its schools under Title VII. *See Bostock v. Clayton County*, 590 U.S. 644, 659-62 (2020).

## CONCLUSION

This Court should deny Plaintiff's motion for emergency and preliminary relief.

---

[30] School-based gender-affirming policies are linked to dramatic decreases in depression, anxiety, and suicidal ideation among transgender and nonbinary students. *See* Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022), https://tinyurl.com/ms6eubb7.

[31] *See also Tennessee v. U.S. Dep't of Agric.*, 665 F. Supp. 3d 880, 916 (E.D. Tenn. 2023) (concluding statute prohibiting sex discrimination for SNAP and SNAP-Ed funding recipients "unambiguous[ly]" prohibited gender identity discrimination, "and always has"); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. Sept. 20, 2018) ("[t]he plain language of Section 1557 [of the Patient Protection and Affordable Care Act] incorporates Title IX and its prohibition on sex discrimination. . . . [d]efendants were on notice that Section 1557's nondiscrimination requirements encompassed gender-identity discrimination.").

Dated: July 17, 2024

Respectfully submitted,

**MATTHEW J. PLATKIN**
*Attorney General, State of New Jersey*

**ROB BONTA**
*Attorney General, State of California*

/s/ Giancarlo G. Piccinini

/s/ Edward Nugent

GIANCARLO G. PICCININI
(Appearing *pro hac vice*)
JESSICA L. PALMER
ANDREW H. YANG
AMANDA I. MOREJÓN
LAUREN E. VAN DRIESEN
Deputy Attorneys General
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07101
(973) 648-3574
Giancarlo.Piccinini.@law.njoag.gov

EDWARD NUGENT
CHRISTINA RIEHL
Deputy Attorneys General
LAURA L. FAER
Supervising Deputy Attorney General
California Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 94612-0552
(510) 879-3305
Edward.Nugent@doj.ca.gov

*Attorneys for Amicus Curiae State of New Jersey*

*Attorneys for Amicus Curiae State of California*

**MICHELLE HENRY**
*Attorney General, Commonwealth of Pennsylvania*

/s/ Lisa E. Eisenberg

LISA E. EISENBERG
Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 560-2980
leisenberg@attorneygeneral.gov

*Attorney for Amicus Curiae Commonwealth of Pennsylvania*

*[additional counsel listed on subsequent pages]*

## ADDITIONAL COUNSEL

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W.
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i, 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA  02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

15