## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-24-00461-JD |
| | ) | |
| MIGUEL CARDONA, in his official capacity | ) | |
| as the Secretary of Education; and UNITED | ) | |
| STATES DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

"Our Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (quoting *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983)). Our founders understood that, "[t]o safeguard individual liberty, '[s]tructure is everything.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2275 (2024) (Thomas, J., concurring) (second alteration in original) (quoting A. Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008)). So, "[b]ecause the Constitution gives the Executive Branch only '[t]he executive Power,' executive agencies may constitutionally exercise only that power." *Id.* at 2274 (second alteration in original) (quoting Art. II, § 1, cl. 1).

With these principles in mind, the Court tackles a question, at least preliminarily, that has not yet been addressed by the Supreme Court of the United States or the United States Court of Appeals for the Tenth Circuit: whether an agency exceeds its authority by

deciding that sex discrimination under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), includes discrimination based on gender identity.

Before the Court is the State of Oklahoma's ("State") Motion for Preliminary Injunction [Doc. No. 21]. The State seeks to preliminarily enjoin the United States Department of Education ("Department") from enforcing its new Title IX regulation: *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106, et seq.) ("Final Rule"). The Final Rule consists of 423 pages.[1]

Defendants Miguel Cardona, in his official capacity as the Secretary of Education, and the United States Department of Education (collectively, "Department") filed a response [Doc. No. 40], and the State filed a reply [Doc. No. 43]. The Court also considers the State's supplement [Doc. No. 41] and the amicus brief filed by the states of New Jersey, California, Pennsylvania, Colorado, Delaware, District of Columbia, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, New York, Oregon, Rhode Island, Vermont, and Washington [Doc. No. 45]. The parties also filed notices of supplemental authority. [Doc. Nos. 46, 47].

Upon review and consideration, and for the following reasons, the Court grants the State's Motion.

---

[1] This is according to https://www.govinfo.gov/content/pkg/FR-2024-04-29/pdf/2024-07915.pdf (last visited July 30, 2024), which is a three-column format PDF. According to Westlaw, the Final Rule is 664 pages in PDF format. 89 Fed. Reg. 33474, 2024 WL 1833438.

I.    **BACKGROUND**

On April 29, 2024, the Department published the Final Rule. The Final Rule seeks to "amend[] the regulations implementing Title IX" and "better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate." 89 Fed. Reg. at 33474.

The Final Rule "clarif[ies] that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 33476 (to be codified as 34 C.F.R. § 106.10). It also imposes a "de minimis harm" standard, which states

> [i]n the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

*Id.* at 33887 (to be codified as 34 C.F.R. § 106.31(a)(2)).

The Final Rule also changes Title IX's harassment regulations. Currently, sexual harassment is defined as "conduct on the basis of sex" that is "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30 (emphasis added). The Final Rule changes this term to "sex-based harassment" and defines it as "sexual harassment and other harassment on the basis

3

of sex, including on the bases described in § 106.10." 89 Fed. Reg. at 33884 (to be codified as 34 C.F.R. § 106.2). "Hostile environment harassment" is then defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* (emphasis added). Plus, now "a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States." *Id.* at 33530.

The Final Rule does not "articulate a specific definition of 'gender identity,'" but "[t]he Department understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33809. Recipients of federal funds may "rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." *Id.* at 33819. They may not, however, "requir[e] a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity." *Id.*

The Final Rule takes effect on August 1, 2024. States and their schools risk losing federal funding if they do not comply with the Final Rule. 20 U.S.C. § 1681. Various states and entities filed lawsuits challenging the Final Rule and seeking to enjoin its enforcement. To the best of the Court's knowledge, almost every district court judge that

4

has ruled on a preliminary injunction in those cases has granted one and preliminarily enjoined enforcement of the Final Rule.[2]

In Oklahoma, there are 1,805 public school sites serving primary and secondary school-aged children. Okla. Dep't of Educ., Oklahoma Public Schools: Fast Facts 2021-22, https://sde.ok.gov/sites/default/files/documents/files/Fast%20Facts%202021-22.pdf (last visited July 30, 2024). In 2023, the federal government allocated $224,659,304 to the Oklahoma State Department of Education to fund Oklahoma schools. Off. of Elementary & Secondary Educ., Funding Status & Awards, Dep't of Educ., https://oese.ed.gov/offices/office-of-formula-grants/school-support-and-

---

[2] So far, the cases in which courts have preliminarily enjoined enforcement of the Final Rule include: *Louisiana v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 2978786, at *21 (W.D. La. June 13, 2024), *appeal docketed*, No. 24-30399 (5th Cir. June 25, 2024); *Tennessee v. Cardona*, --- F. Supp. 3d ----, 2024 WL 3019146, at *44 (E.D. Ky. June 17, 2024), *appeal docketed*, No. 24-5588 (6th Cir. June 26, 2024); *Kansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 3273285, at *22 (D. Kan. July 2, 2024), *appeal docketed*, No. 24-3097 (10th Cir. July 11, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342, at *16 (N.D. Tex. July 11, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 3381901, at *7 (N.D. Tex. July 11, 2024); and *Arkansas v. U.S. Dep't. of Educ.*, No. 4:24 CV 636 RWS, 2024 WL 3518588, at *23 (E.D. Mo. July 24, 2024). In *Alabama v. Cardona*, No. 24-533, slip op. at 122, (N.D. Ala. July 30, 2024), the district judge denied the State of Alabama's motion for a preliminary injunction. *See* Defs.' Notice [Doc. No. 47].

The Fifth Circuit denied a request to stay a preliminary injunction in *Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *1 (5th Cir. July 17, 2024). The Sixth Circuit denied a request to stay a preliminary injunction in *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *1 (6th Cir. July 17, 2024). The Department has filed applications for a partial stay of the injunction at the Supreme Court, but as of this Court's last review of the Supreme Court docket, the Supreme Court has not yet acted. *See Dep't of Educ. v. Louisiana*, (No. 24A78); *Cardona v. Tennessee*, (No. 24A79).

accountability/title-i-part-a-program/funding-status/ (last visited July 30, 2024). All these

schools receive federal funds, and thus, are Title IX recipients.[3]

The State filed suit on May 6, 2024, seeking declaratory judgment in its favor,

vacatur of the Final Rule, and a permanent injunction keeping the Department from

withholding Title IX funding from the State for refusal to comply with the Final Rule. It

filed its Motion on June 28, 2024. Expedited briefing concluded on July 18, 2024. Given

this timeframe, the quantity of legal challenges to the Final Rule, and the quality of the

recent orders filed in the cases granting preliminary injunctions, the Court will not fully

restate the regulatory landscape or Title IX's history. Instead, the Court focuses its

analysis on the portions of the 423-page Final Rule that are directly relevant to resolving

the State's Motion.

## II.   LEGAL STANDARD

To obtain a preliminary injunction, the State must show the following elements

weigh in its favor: "'(1) [it] is substantially likely to succeed on the merits; (2) [it] will

suffer irreparable injury if the injunction is denied; (3) [its] threatened injury outweighs

the injury the opposing party will suffer under the injunction; and (4) the injunction

would not be adverse to the public interest.'" *Brooks v. Colo. Dep't of Corr.*, 730 F.

---

[3] The Department does not dispute that the State receives funds from the federal
government, nor does it dispute the quantity of those funds. *See Dine Citizens Against
Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1028 n.5 (10th Cir. 2023) ("It is within this
court's discretion to take judicial notice of a fact or a document. 'Judicial notice is proper
when a fact is beyond debate.'" (internal citation omitted) (quoting *The Estate of Lockett
ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016))).

App'x 628, 630 (10th Cir. 2018) (unpublished) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). The third and fourth elements "merge" when the government is the party opposing the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citations omitted).[4]

"'Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.'" *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370 (10th Cir. 1996) (alteration in original) (emphasis omitted) (quoting Fed. R. Civ. P. 65). "[T]rial courts have 'wide discretion under Rule 65(c) in determining whether to require security . . . .'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

---

[4] There are three types of preliminary injunctions that are disfavored: "'(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'" *Id.* at 1259 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc)). Neither party argues that the State's requested injunction falls into any of these categories. But even if it did, the Court is satisfied the State has made a "'strong showing'" that the "likelihood-of-success-on-the-merits and the balance-of-harms factors" weigh in its favor. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

III.   <u>ANALYSIS</u>

**A. The State is substantially likely to succeed on the merits.**

Starting with the first element, the State argues it is substantially likely to succeed on the merits of its case because the Final Rule exceeds statutory authority, violates the Constitution, and is arbitrary and capricious. As further explained below, the Department disagrees with these arguments.[5]

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" unless an enumerated exception applies. 20 U.S.C. § 1681(a). Congress "empowered" the Department to issue "rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute . . . ." 20 U.S.C. § 1682.

However, Congress also enacted the Administrative Procedure Act ("APA") "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). The APA "was the culmination of a 'comprehensive rethinking of the place of administrative agencies in a regime of separate and divided powers.'" *Id.* (quoting

---

[5] In its Motion, the State briefly argued that the Final Rule violates the Tenth Amendment. The Department briefly responded to this argument in its Response. The Court does not address this claim because even without it, the State has shown it is substantially likely to succeed on the merits.

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986)). Under the APA, courts "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. It requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction," or "without observance of procedure required by law." *Id.*

1. The Department's interpretation of "sex" exceeds its statutory authority.

The State argues that the Final Rule is contrary to Title IX's text, and therefore, the Department's implementation of the Final Rule exceeds its statutory authority. The Department argues that the Final Rule's "specification that Title IX prohibits discrimination on the basis of gender identity is compelled by the statutory text." [Doc. No. 40 at 13].

"[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Loper*, 144 S. Ct. at 2273. When analyzing whether an agency has acted within its statutory authority, the Court starts with the text of the statute. *Id.* at 2262 ("The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions."). "Proper interpretation of a word 'depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedent[s] or authorities that inform the analysis.'" *United States v. Ko*, 739 F.3d 558,

9

560 (10th Cir. 2014) (alteration added) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)).

"Sex" is not defined in Title IX. However, "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper*, 144 S. Ct. at 2262. And, as this Court has previously noted, "at the time Title IX was enacted, 'sex' was defined by biology and reproductive functions"—not gender identity or sexual orientation. *Bridge ex rel. Bridge v. Okla. State Dep't of Educ.*, --- F. Supp. 3d ----, 2024 WL 150598, at \*7 (W.D. Okla. Jan. 12, 2024). Numerous dictionaries published around the time of Title IX's passage confirm this conclusion. *See infra* note 8; *cf. In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014) ("Dictionary definitions are useful touchstones to determine the 'ordinary meaning' of an undefined statutory term." (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012))). In fact, the Department does not appear to say otherwise. Instead, it maintains that per the amended 34 C.F.R. § 106.10, (biological) sex discrimination by definition includes discrimination on the basis of gender identity. It premises this argument on *Bostock v. Clayton County*, 590 U.S. 644 (2020).

In *Bostock*, the Supreme Court ruled that an employer violates Title VII of the Civil Rights Act of 1964 by firing an individual "for being gay or transgender." *Id.* at 683. However, it made clear that the opinion did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination." *Id.* at 681. Even in the Title VII context, the Supreme Court did "not purport to address bathrooms, locker rooms, or

anything else of the kind." *Id.* The opinion only answered the question of "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

In light of these disclaimers, the Court is not convinced that *Bostock* stands for the proposition that sex discrimination occurs anytime someone is treated differently based on their gender identity. Yet, that is essentially what the Department argues. "[I]t is suspect that the Department bases its explanation for changing its interpretation of a term—again, whose meaning has been unchanged since the statute was enacted—by relying on reasoning that the highest court said was inapplicable." *Tennessee v. Cardona*, --- F. Supp. 3d ----, 2024 WL 3019146, at *33 (E.D. Ky. June 17, 2024). Plus, if *Bostock*'s rationale does not even apply to bathrooms or locker rooms in the Title VII context, why would it apply to bathrooms and locker rooms in the Title IX context? The Department does not offer an adequate explanation to this question.

Additionally, such an interpretation would be at odds with Title IX's purpose. Leading up to Title IX's passage, all relevant congressional statements, hearings, and reports focused on discrimination *women* faced in education. *See* 116 Cong. Rec. 6398, 6400 (1970) (Rep. Martha Griffiths) ("It is shocking and outrageous that universities and colleges, using Federal moneys, are allowed to continue treating women as second-class citizens, while the Government hypocritically closes its eyes."); 117 Cong. Rec. 22735, 22735 (1971) (Sen. Birch Bayh) ("To my mind our greatest legislative failure relates to our continued refusal to recognize and take steps to eradicate the pervasive, divisive, and unwarranted discrimination against a majority of our citizens, the women of this

country."); 118 Cong. Rec. 5806, 5808 (1972) (Sen. Birch Bayh) ("While the impact of this [proposed legislation] would be far-reaching, it is not a panacea. It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.").

This purpose is confirmed by Title IX's text. Yet the Final Rule elevates gender identity and its accompanying protections above that of biological sex—i.e., women. Such a contradiction of Title IX's text and an erosion of its purpose cannot be permitted absent congressional action.[6] Of course, the Court understands that the Department only seeks to enact regulations that the executive branch believes are beneficial to the nation. However, "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983).

---

[6] In the past, when courts have determined that a statute's text does not protect certain groups of people, Congress has stepped in and passed legislation so the people's will is effectuated. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 88–89 (1983) ("[T]his Court ruled that discrimination based on pregnancy was not sex discrimination under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq. (1976 ed.). *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976). Congress overcame the *Gilbert* ruling by enacting § 1 of the Pregnancy Discrimination Act of 1978, 92 Stat. 2076, 42 U.S.C. § 2000e(k) (1976 ed., Supp. V), which added subsection (k) to § 701 of the Civil Rights Act of 1964.") (footnotes omitted). That is the proper mechanism for expanding statutory protections. It is not by enacting far-reaching regulations or turning to the judiciary for expansion.

Having considered the statute's unambiguous text, purpose, and other subsequent binding precedent, such as *Bostock*, the Court concludes the State is likely to succeed on its claim that the Department exceeded its statutory authority under Title IX by implementing a regulation that expands sex discrimination to include discrimination on the basis of gender identity.[7]

2. Even if the Department did not clearly exceed its authority, the major questions doctrine counsels against adopting the Department's interpretation and expansion of Title IX.

The State argues that by enacting the Final Rule, the Department seeks to decide a major question that Congress did not clearly authorize it to decide. The Department argues that the major questions doctrine is inapplicable because the text of the statute controls, and the Final Rule is consistent with Title IX's text.

As stated previously, Title IX's unambiguous and clear text shows the State is substantially likely to succeed on the merits of its case. However, if the statute's text contained ambiguity regarding whether discrimination on the basis of sex also included discrimination based on "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," the major questions doctrine would counsel against such an interpretation. "[I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make [the

---

[7] Grounding much of its analysis in *Bostock*, the Tenth Circuit recently decided that discrimination based on transgender status is discrimination on the basis of sex that implicates the Equal Protection clause. *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). But nothing in *Fowler* suggests it applies outside the Equal Protection context. And for the same reasons as stated above, absent a mandate to the contrary, the Court will not apply *Fowler*'s analysis to Title IX—a statutory framework to which it is ill suited.

Supreme Court] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Thus, the "[m]ajor [q]uestions [d]octrine applies where 'an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy' or make 'decisions of vast economic and political significance.'" *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 725 (10th Cir. 2024) (quotations omitted) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324). In such situations, the doctrine requires "something more than a merely plausible textual basis for the agency action." *West Virginia*, 597 U.S. at 723. "The agency instead must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

The Department's claim that it can expand "sex" in Title IX to include "gender identity" despite several decades of "sex" solely meaning the biological differences between men and women falls flat. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion) (explaining that "sex, like race and national origin, is an immutable characteristic"); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (using the term "sex classifications" when discussing laws and policies that treat individuals based on whether they are biological "women" or "men"); *see also id.* (discussing the "[i]nherent differences between men and women" without referring to gender identity). The debate regarding the relationship between sex and gender identity is a motivating factor behind countless lawsuits, legislation, and political debates. The enactment of the Final Rule is the essence of an agency claiming to discover, in a statute that has been

14

enacted for over fifty years, a previously unknown power to decide how broadly "sex" is defined and applied—i.e., a decision of vast political significance. So, even if there was a plausible textual basis for the Department's interpretation of Title IX, the Department would need to point to clear congressional authorization for its ability to redefine sex in a way that includes or implicates gender identity. The Department has not done so, and Congress has not clearly given the Department authority to redefine sex in a way that would be inconsistent with other portions of the statute. Therefore, the Court determines the State is substantially likely to succeed on its claim that the major questions doctrine prohibits the Department from enforcing the Final Rule.

3.   The State is substantially likely to succeed on its constitutional claims.

a.   *The Final Rule likely violates the First Amendment.*

The State argues that the Final Rule's new harassment provisions violate the First Amendment and contradict *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 640 (1999). The Department argues that the Final Rule has no such problems because it explicitly provides that "'nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment.'" [Doc. No. 40 at 25] (quoting 89 Fed. Reg. at 33503). Additionally, it notes that the standard set forth in the Final Rule does not need to comply with *Davis* because "*Davis* addressed the standard required in a private action for damages," not administrative enforcement. *Id.* at 22.

The First Amendment states, "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "First Amendment rights, applied in light

15

of the special characteristics of the school environment, are available to teachers and students." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). In *Davis*, the Supreme Court held that "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." 526 U.S. at 652. This standard for harassment accounted for both a school's need to exercise "disciplinary authority" and limit exposure "to constitutional or statutory claims." *Id.* at 649. The Supreme Court highlighted, however, that, Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Id.* at 644. "Moreover, because the harassment must occur 'under' 'the operations of' a funding recipient, *see* 20 U.S.C. § 1681(a); § 1687 (defining 'program or activity'), the harassment must take place in a context subject to the school district's control . . . ." *Id.* at 645.

The amended 34 C.F.R. § 106.2 has significantly strayed from this standard. It has changed the "severe *and* pervasive" standard to a "severe *or* pervasive" standard, altered the "denies" equal access condition to a "limits or denies" equal access condition, and added a subjective component to the "objectively offensive" requirement. The Final Rule does not define what "objectively offensive" means, but given the regulation's text, it is reasonable to assume that refusal to affirm someone's gender identity would fall into this category. Perhaps most notably, it largely expands the Department's reach outside the classroom and off campus. For example, the Final Rule says

16

a recipient's obligation is to address all forms of sex discrimination, including sex-based harassment that occurs within the recipient's education program or activity, whether the conduct takes place online, in person, or both. Online harassment can include, but is not limited to, unwelcome conduct on social media platforms such as sex-based derogatory name-calling, the nonconsensual distribution of intimate images (including authentic images and images that have been altered or generated by artificial intelligence (AI) technologies), cyberstalking, sending sex-based pictures or cartoons, and other sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity.

89 Fed. Reg. 33474, 33515.

Regardless, the Department argues the *Davis* standard is not binding because a suit for damages is different than administrative enforcement. In support, it highlights that prior regulations imposed a standard similar to that which is found in the Final Rule. *See* 1997 Sexual Harassment Guidance, 62 Fed. Reg. 12034, 12040 (condemning harassment that was "sufficiently severe, persistent, or pervasive to create a hostile environment"). But this argument minimizes the Final Rule's other changes that undeniably further broaden the "severe or pervasive" standard. When the "severe or pervasive" standard is applied alongside the expanded definition of sex discrimination in § 106.10 and the added condition that a recipient must address a sex-based hostile environment even when the alleged conduct occurred "outside the United States," the likelihood of a constitutional violation is apparent. 89 Fed. Reg. 33530. Even the *Davis* Court explained that its opinion applying the severe *and* pervasive standard should "not mislead courts to impose *more sweeping liability than we read Title IX to require*." 526 U.S. at 652 (emphasis added). And changing "and" to "or" only makes Title IX's liability more sweeping.

17

Whether conduct or speech is considered harassment under the Final Rule is
dependent on broad statements and vague terminology that the Department has elected
not to define. Additionally, the new harassment regulations in the amended § 106.2 do
not comport with the standard set out in *Davis*. This, along with the above mentioned
First Amendment concerns, leads the Court to conclude that these considerations weigh
in favor of the State with respect to its substantial likelihood of success on the merits.

     b.   *The Final Rule's conditions likely violate the Spending Clause.*

The State argues that because Congress did not unambiguously state Title IX's
prohibition against sex discrimination includes discrimination based on gender identity,
the Final Rule's conditions are in violation of the Spending Clause. The Department
continues to rely on *Bostock* and argues that "§ 106.10 merely sets forth the meaning of
Title IX's unambiguous statutory text." [Doc. No. 40 at 30].

"The Spending Clause provides that '[t]he Congress shall have Power To . . .
provide for the common Defence and general Welfare of the United States.'" *Pittsburg
Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 716 (10th Cir. 2004)
(alterations in original) (quoting U.S. Const. art. I, § 8, cl. 1). Title IX is "legislation
enacted pursuant to Congress' authority under the Spending Clause." *Davis*, 526 U.S. at
640. This type of legislation is "'much in the nature of a contract: in return for federal
funds, the States agree to comply with federally imposed conditions.'" *Id.* (quoting
*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "[B]ut when
Congress attaches conditions to a State's acceptance of federal funds, the conditions must

18

be set out 'unambiguously . . . .'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548

U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

Congress chose to use the term "sex" in Title IX. "Sex" unambiguously means the

biological differences between male and female. In the context of Title IX, the concepts

of sex and gender identity are distinct and independent of one another. Thus, Title IX's

text does not give the State "clear notice" that its acceptance of funds is conditioned on

its treatment of an individual's gender identity. *See id.* at 300. Without clear notice

provided by Congress that "on the basis of sex" has been expanded to include gender

identity under Title IX, the Department cannot premise the receipt of federal funds off

compliance with the Final Rule. Therefore, this element weighs in favor of the State with

respect to its substantial likelihood of success on the merits.

    4.  <u>The State is substantially likely to succeed in showing the Department acted in an arbitrary and capricious manner in passing the Final Rule.</u>

The State argues that the Department acted in an arbitrary and capricious manner

because (1) it failed to offer a reasoned explanation for the Final Rule's departure from

the historic understanding of "sex" and (2) the Final Rule is unexplainably internally

inconsistent. The Department contends the Final Rule is consistent with Supreme Court

precedent and that it "is not inconsistent for the Final Rule to distinguish sex separation

expressly permitted by Congress, listed in § 106.31(a)(2), from sex separation permitted

by regulation in other contexts." [Doc. No. 40 at 27].

According to the Tenth Circuit, an agency's decision is arbitrary and capricious

    if the agency (1) "entirely failed to consider an important aspect of the
    problem," (2) "offered an explanation for its decision that runs counter to

19

the evidence before the agency, or is so implausible that it could not be
ascribed to a difference in view or the product of agency expertise," (3)
"failed to base its decision on consideration of the relevant factors," or (4)
made "a clear error of judgment."

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir.

2017) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683,

704 (10th Cir. 2009)). "The duty of a court reviewing agency action under the 'arbitrary

or capricious' standard is to ascertain whether the agency examined the relevant data and

articulated a rational connection between the facts found and the decision made."

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). "[T]he

arbitrary and capricious standard focuses on the rationality of an agency's decision

making process rather than on the rationality of the actual decision . . . ." *Colo. Wild v.*

*U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

The Final Rule's understanding of what "sex" means departs from the definition

this term had for decades.[8] Expanding the definition of such a crucial term creates

unexplained inconsistency with Title IX's text, purpose, and former Department

---

[8] In 1961, the Oxford English Dictionary defined sex as "[t]he sum of those
differences in the structure and function of the reproductive organs on the ground of
which beings are distinguished as male and female, and of the other physiological
differences consequent on these." *The Oxford English Dictionary* 578 (1961). In 1970,
the American College Dictionary defined sex as "the sum of the anatomical and
physiological differences with reference to which the male and the female are
distinguished." *The American College Dictionary* 1109 (1970). In 1979, Webster defined
it as "the sum of the structural, functional, and behavioral characteristics of living beings
that subserve reproduction by two interacting parents and that distinguish males and
females." *Webster's New Collegiate Dictionary* 1054 (1979). In 1996, the Supreme Court
recognized that the "[p]hysical differences between men and women . . . are enduring"
and the "'two sexes are not fungible . . . .'" *United States v. Virginia*, 518 U.S. 515, 533
(1996) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)).

20

interpretations. *See* Dep't of Just. & Dep't of Educ., Dear Colleague Letter, Feb. 22,

2017, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf

(explaining that the Department is rescinding guidance documents "requir[ing] access to

sex-segregated facilities based on gender identity" because those guidance documents did

not "contain extensive legal analysis or explain how the position is consistent with the

express language of Title IX"). This is "a reason for holding an interpretation to be an

arbitrary and capricious change from agency practice under the [APA]." *Nat'l Cable &

Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). However, the

Department says there was not a "'long-standing construction' of the term 'sex' in Title

IX to mean 'biological sex.'" 87 Fed. Reg. 41390, 41537. Although it has previously

"articulated a narrower interpretation of the scope of Title IX's prohibition on sex

discrimination," *id.* at 41531 (citing 2001 Revised Sexual Harassment Guidance at 3;

2010 Dear Colleague Letter on Harassment and Bullying at 8; Preamble to the 2020

Amendments, 85 Fed. Reg. 30178), the Department "now believes that its prior position

(i.e., that Title IX's prohibition on sex discrimination does not encompass discrimination

based on sexual orientation and gender identity) is at odds with Title IX's text and

purpose and the reasoning of the *Bostock* Court." 87 Fed. Reg. at 41531.

    "Disagreement with its own past interpretation constitutes a concession that a

longstanding interpretation indeed has existed." *Tennessee v. Cardona*, --- F. Supp.

3d ----, 2024 WL 3019146, at *32 (E.D. Ky. June 17, 2024), *appeal docketed*, No. 24-

5588 (6th Cir. June 26, 2024). And the primary reason it gives for changing its

interpretation is *Bostock*. But for the reasons previously explained, basing the Final Rule

off *Bostock* does not reflect reasoned decision making. *Bostock* was never intended to have a sweeping impact on Title VII, let alone Title IX. "Ultimately, there is little reason in the Department's purportedly 'reasoned explanation' for departing from its longstanding interpretation of sex as a binary construct because *Bostock* did not expand the meaning of 'sex' within Title IX." *Id.* at *33.

Additionally, the gender identity mandate is inexplicably logically inconsistent with several provisions of Title IX. The Department acknowledges that Title IX "created exceptions to that general nondiscrimination mandate in 20 U.S.C. 1681(a)(1)–(9), and also carved out from its general nondiscrimination mandate the maintenance of sex-separate living facilities in 20 U.S.C. 1686." 89 Fed. Reg. 33474, 33818. And yet, the amended § 106.31 says recipients cannot discriminate on this basis when it comes to locker rooms or bathrooms if such action subjects "a person to more than de minimis harm." *Id.* at 33887. In application, this means recipients can have male and female dormitories and assign students to particular dorms based on their biological sex. However, for bathrooms and locker rooms, sex-separate facilities are only allowed to the extent they do not prevent individuals from using the bathroom or locker room consistent with their gender identities. So, if a biological male identifies as a female, the biological male can be required to sleep in the boys dorm but must be allowed to use the girls locker room. This approach undercuts Title IX's purpose, epitomizes a clear error in judgment, and entirely fails to consider important aspects of the problem the Department sought to resolve.

Therefore, the Court holds that the State is substantially likely to succeed in showing that the Department acted in an arbitrary and capricious manner.

5.  The Court does not consider the parties' arguments regarding athletics.

To the extent the parties raise arguments regarding the Final Rule's impact on athletics, the Court does not consider these. The Final Rule explicitly "permits different treatment or separation on the basis of sex" in accordance with 34 C.F.R. § 106.41, which is the current regulation that addresses athletics.

The Court notes that the Department has issued a Notice of Proposed Rulemaking titled, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22860 (Apr. 13, 2023). Were this regulation to take effect, it would significantly change the legal landscape surrounding athletics.

However, as it stands, this regulation is not a final agency action. *See Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 864 F.3d 1105, 1113 (10th Cir. 2017) ("As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process[ ]—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." (alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997))). Thus, the Court does not have jurisdiction to consider this claim. *Cherry v. U.S. Dep't of Agr.*, 13 F. App'x 886, 890 (10th Cir. 2001) (unpublished) ("[T]he finality of an agency action is jurisdictional . . . .").

23

**B. The State will suffer irreparable harm if the injunction is denied.**

Turning to the second element, the State argues that if the Final Rule is allowed to take effect, it will suffer irreparable harm because it will be "unable to enforce its own laws without coming into conflict with the Final Rule." [Doc. No. 21 at 35]. The State also contends it will suffer from nonrecoverable compliance costs. The Department argues that the State's claim of unrecoverable compliance costs is speculative and that, "[r]egardless of whether the Rule preempts any state's laws, if the Department is prevented from administering the Rule, the Department, not Plaintiff, faces significant irreparable harm." [Doc. No. 40 at 33].

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "If the harm is not 'likely to occur before the district court rules on the merits,' there is no need for preliminary injunctive relief." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021) (quoting *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017)).

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *New Mexico Dep't of Game & Fish*, 854 F.3d at 1254 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). "The loss of First Amendment freedoms, for even minimal periods of time, unquestioningly constitutes irreparable injury." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir. 2005) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality

24

opinion)). And "[i]mposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010).

If the State is required to follow the Final Rule, it will be enjoined from effectuating laws like Okla. Stat. tit. 70, § 1-125—the statute that requires individuals to use the restrooms in public schools that match their biological sex. And as previously analyzed, the Final Rule is likely to violate students' and teachers' First Amendment rights. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." (emphasis omitted)). Lastly, the State will incur compliance costs by implementing the Final Rule's provisions, and the Court is unaware of any mechanism through which the State could recover these compliance costs should the Final Rule later be permanently enjoined, and the Department does not offer any. For these reasons, the Court concludes that this element weighs in favor of the State.

### C. The State's threatened injury outweighs the injury the Department would suffer, and a preliminary injunction is in the public interest.

Addressing the third and fourth elements which are merged, the State argues that the injuries it faces outweigh the harm to the Department. It maintains that enforcing an unlawful regulation is not in the public interest. The Department argues that if injunctive relief is granted, the federal government will be unable to prevent sex discrimination in education environments, which would have a negative effect on the public interest.

When evaluating the balance of equities, the Court "do[es] not reject out of hand that the administrative burdens of compliance" can constitute "a real harm." *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016). Plus, when a law, or in this case, a regulation is "likely unconstitutional" the interest of letting it take effect does not outweigh having "constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). In the statutory context, "our 'democratically elected representatives . . . are in a better position than this Court to determine the public interest[;] . . . [t]he courts' peculiar function is to say what the law is, not to second-guess democratic determinations of the public interest.'" *Fish*, 840 F.3d at 755 (alterations in original) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003)).

The equities do not favor the Department and the public interest is not served when the law is misapplied or constitutional rights are violated. Since the current regulations have been in effect for decades, there is little harm in maintaining the status quo through the pendency of this suit. Additionally, recipients have only been given three months to comply with all the Final Rule's changes. Federal funds that go to school programs, salaries, etc. are on the line. For these reasons, neither the equities nor the public interest favors the Department.

**D. The Final Rule is preliminarily enjoined in its entirety.**

Finally, the Department argues that if the Court grants the State relief, it should limit the injunction to apply only to § 106.31(a)(2) and § 106.2's definition of "hostile environment harassment." The Department contends that since the Final Rule is severable, "[t]he Court should not enjoin § 106.10, which when properly understood

26

could not cause the harm that [the State] alleges." [Doc. No. 40 at 37]. The State argues the Court should preliminarily enjoin the entire Final Rule from going into effect because it has shown a substantial likelihood of success on the merits of its claim pertaining to § 106.10, and "the new definition of sex discrimination, appears to touch every substantive provision of the Rule." [Doc. No. 43 at 12 (alteration omitted)].

Based on the above analysis regarding the amended §§ 106.10, 106.2's definition of hostile environment harassment, and 106.31(a), the Court is satisfied that the State has met its burden of showing these portions of the Final Rule should be preliminarily enjoined from taking effect. The issue then becomes whether the Court should sever these provisions from the rest of the Final Rule or preliminarily enjoin the Final Rule in its entirety. *See* 89 Fed. Reg. 33474, 33848 ("The Department also confirms that each of the provisions in the final regulations is intended to operate independently of each other and that the potential invalidity of one provision should not affect the other provisions."). "[T]he problem is that these provisions, particularly the new definition of sex discrimination, appear to touch every substantive provision of the [Final Rule]." *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *3 (6th Cir. July 17, 2024).

For example, §§ 106.8(f), 106.2, 106.8, 106.11, 106.40, 106.44, 106.45, 106.46, and 106.71 all implicate the new definition of sex discrimination. "It is hard to see how all of the schools covered by Title IX could comply with this wide swath of new obligations if the Rule's definition of sex discrimination remains enjoined." *Id.* at *4. Plus, the Department does not explain how the Final Rule would even operate without § 106.10. Lastly, because of the State's showing that the Department acted in an arbitrary

and capricious manner in its enactment of the Final Rule, the Court determines

preliminarily enjoining the Final Rule in its entirety is appropriate.

## IV.   __CONCLUSION__

"The growth of the Executive Branch, which now wields vast power and touches

almost every aspect of daily life, heightens the concern that it may slip from the

Executive's control, and thus from that of the people." *Free Enter. Fund v. Pub. Co. Acct.*

*Oversight Bd.*, 561 U.S. 477, 499 (2010). Thus, when the executive branch oversteps its

constitutional or statutory bounds via agency action, the judiciary must fulfill its role and

ensure the "carefully defined limits" on each branches' power are not "eroded." *Immigr.*

*& Naturalization Serv. v. Chadha*, 462 U.S. 919, 957–58 (1983).

The Court determines, based on its analysis above, that the Motion for Preliminary

Injunction [Doc. No. 21] filed by the State of Oklahoma should be GRANTED. The

United States Department of Education and Miguel Cardona, Secretary of the U.S.

Department of Education, along with their secretaries, directors, administrators, and

employees, are preliminarily ENJOINED and RESTRAINED from implementing,

enacting, enforcing, or taking any action in any manner to enforce the Final Rule,

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving*

*Federal Financial Assistance*, 89 Fed. Reg. 33474 (Apr. 29, 2024), which is scheduled to

take effect on August 1, 2024. The preliminary injunction is limited to the State of

Oklahoma. The Court does not require a security.[9]

      IT IS SO ORDERED this 31st day of July 2024.

 

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[9] Neither party raises nor briefs the necessity of a security under Rule 65(c). In light of the relevant facts and the State's substantial likelihood of success on the merits, the Court concludes a security is not necessary.

29